In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1731

WILLIAM JOHNSON,

*Petitioner-Appellee*,

*v.*

GERARDO ACEVEDO, Warden,
Hill Correctional Center,

*Respondent-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 5351—**Harry D. Leinenweber**, *Judge*.

ARGUED SEPTEMBER 3, 2008—DECIDED JULY 14, 2009

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. William Johnson is serving
sentences aggregating 50 years' imprisonment for armed
robbery, aggravated battery, and use of a weapon by a
convicted felon. A jury in Illinois convicted him of these
offenses following a trial at which one of his cousins,
plus two employees of a McDonald's restaurant, testified
that he entered the restaurant with a sawed-off shotgun

and robbed the cash registers, shooting and injuring one of the employees in the process. Johnson testified at trial that he had been buying auto supplies while his cousin robbed the restaurant. A federal district court issued a writ of habeas corpus under 28 U.S.C. §2254 after concluding that the prosecutor had violated the rule of *Doyle v. Ohio*, 426 U.S. 610 (1976), by asking Johnson why he failed to relate this story when interviewed the day after the robbery. 544 F. Supp. 2d 683 (N.D. Ill. 2008). The state contends that *Anderson v. Charles*, 447 U.S. 404 (1980), permits the prosecutor to pursue this line of questioning, and that any error is harmless.

A jurisdictional problem delayed consideration of this appeal. The district court entered a judgment that reads, in full: "IT IS HEREBY ORDERED AND ADJUDGED that the petitioner, William Johnson's petition for a Writ of Habeas Corpus is conditionally granted." This sounds like a writ will issue in the future if some condition is satisfied—but what condition? The district judge's opinion says that the state must release Johnson unless he is retried within 90 days. That is not a "conditional grant" of anything; it is a decision that Johnson is entitled to a writ that allows the state to choose between retrial and release. But no such writ was issued. A judgment needs to do more than just say that some petition or motion has been granted; it must provide the relief to which the victor is entitled. Until that happens there is no final decision and nothing to appeal.

Every judgment must be self-contained and specify the relief being awarded. See, e.g., *Reytblatt v. Denton*, 812

F.2d 1042 (7th Cir. 1987). A writ of habeas corpus is enforceable by contempt, so it is especially important that the court set out precisely what is required. District courts would cause fewer problems of this kind if they obeyed Fed. R. Civ. P. 58(b)(2), which says that the judge must personally review and approve any judgment other than one implementing a jury's verdict or denying all relief. This judgment was not approved by the judge; it is signed only by a deputy clerk (and not really "signed" even by the clerk; there is just a line with "/s/" followed by a typed name). Rule 58(b) requires review and approval by a judge because deputy clerks cannot read judges' minds and may not use legally appropriate language even if they can discern a judge's objective. (Few deputy clerks are lawyers.) This court put the appeal in stasis while the parties returned to the district court and obtained a proper final judgment. That has been done, so the appeal can proceed.

Johnson's cousin, Jameel White, testified that he drove with Johnson to a McDonald's restaurant, which the two entered to order a meal. (We have drawn this information, and much of what follows, from the opinion of the Appellate Court of Illinois. No one contests that court's narration of what happened at trial.) According to White, Johnson unexpectedly pulled out a sawed-off shotgun and began a robbery; White fled across the street to a Trak Auto store, where Johnson eventually joined him. The two paid a third party to give them a ride. White went home, and Johnson went to a motel. Two employees of the restaurant picked Johnson out of a lineup as the robber and identified him at trial. An

employee of Trak Auto testified that Johnson entered the store and waved a fistful of crumpled bills. Police found in Johnson's car, which had been left in the restaurant's parking lot, some crumpled currency and a sawed-off shotgun; a spent shell was in the gun's chamber. (The robber had fired one round inside the restaurant.) A torn portion of a $20 bill in the car matched the remainder of that bill eventually recovered from Johnson.

Johnson offered a completely different version of events. He testified that White drove him to the Trak Auto store so that he could buy auto supplies. (The car was Johnson's but White was the driver, Johnson testified, because Johnson's driver's license had been revoked.) White dropped him off and continued to the McDonald's restaurant. White met Johnson later, looking jittery, and said that Johnson's car had been involved in some misconduct and should be abandoned. White then arranged for a third party to drive them away, taking White home and Johnson to a motel.

After finding the shotgun and some of the loot in Johnson's car, police naturally wanted to talk with him. They tracked him down at the motel and gave him *Miranda* warnings; an Assistant State's Attorney asked him about the events. The prosecutor tried to offer the resulting statement at Johnson's trial, but the judge excluded it on state-law grounds. (The prosecutor had not turned over a copy of the statement during discovery, as Illinois law requires.) A prosecutor made this offer of proof:

> A.S.A. Keating would state that [Johnson] told him that he woke up at approximately 6:00 a.m. on

> 11/11/98, went for some car parts, had to take Theresa [his sister] to work. He was planning on going to Robbins[, Illinois,] that night for some peace talk for some shooting earlier. He thought he would die that night, so he drank some wine, smoked some crack and weed. He went to a friend's house where he had sex in a bathroom, and he went to his sister's after that, and he remembers being in the hotel when the police came to get him.

This account of his activities on the day of the robbery did not include any information about White driving Johnson to Trak Auto and the other events to which Johnson had testified. The prosecutor asked Johnson a total of 25 questions that were variations on the theme: "If what you have just testified is true, why didn't you tell the Assistant State's Attorney when you made your statement to him?" The state judge sustained objections to 10 of the questions, so there was no error in that respect, see *Greer v. Miller*, 483 U.S. 756 (1987), but he allowed the other 15, and the federal district judge thought this an egregious violation of Johnson's rights.

*Doyle* holds that a defendant who receives *Miranda* warnings, and invokes his right to keep silent, cannot be cross-examined about that silence at trial. The Court's rationale is that *Miranda* warnings should not become a trap. Questions of the "why didn't you say this earlier?" variety ask the jury to infer that an innocent person would have spoken, but *Miranda* warnings supply an explanation other than guilt for a suspect's silence. See *Brecht v. Abrahamson*, 507 U.S. 619, 628–29 (1993). A corol-

lary is that, if the suspect chooses to speak after receiving *Miranda* warnings, then any difference between what the person says before trial, and testimony at trial, may be the subject of questions and comment. That's the holding of *Anderson v. Charles*:

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

447 U.S. at 408. And an out-of-court statement may be called "inconsistent" with the in-court statement because of a curious omission as well as a flat contradiction. Sherlock Holmes recognized in *Silver Blaze* that the dog's failure to bark, when barking would have been expected, conveyed a powerful message. So the Court remarked:

> Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.

*Id*. at 409. This is the idea behind the questions that the prosecutor asked on cross-examination. Johnson told the Assistant State's Attorney what he had done on the day of the robbery. His story left out all of the vital details that he supplied on the stand; the prosecutor then

implied that the story told in court must be a recent invention.

The Appellate Court of Illinois and the federal district court found a constitutional problem for two reasons. First, they observed that Johnson's statement to the Assistant State's Attorney (at least as summarized in the offer of proof) did not mention either White or the robbery, so that the questioning at trial did not cover the same "subject matter" as the statement. Second, they thought it hard to see how Johnson could be questioned about inconsistencies between his trial testimony and his statement to the Assistant State's Attorney, when that statement was not in evidence.

Neither of these points is enough, independently, to support the conclusion that the questions transgressed the holding of *Doyle*. That the statement to the Assistant State's Attorney did not mention White is the very thing that made it so curious. Johnson had been arrested at the motel. He was later questioned about what he did on the day of the robbery. He waived his right to remain silent (and thus, one might think, abandoned the foundation for *Doyle*'s rule). Yet instead of relating facts that, if true, would have led to his release from custody, Johnson said only inconsequential things. A jury might conclude that he did this because he had yet to invent a story that was consistent with innocence—and *Charles* holds that once a suspect agrees to speak he may be questioned about telling omissions, which are a form of inconsistency. See *Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir. 1985) (en banc).

As for the fact that the prosecution did not perform its obligations in discovery: A violation of state law is not the basis for federal collateral relief. See, e.g., *Estelle v. McGuire*, 502 U.S. 62 (1991). Illinois is free to hold as a matter of its own law that, if a defendant's out-of-court statement has been excluded from evidence, no cross-examination to draw out inconsistency between that statement and the in-court testimony is allowable. But that is not what the state's appellate court held. It relied on *Doyle* rather than any state rule restricting cross-examination. Yet *Doyle* does not establish a federal rule that the out-of-court statement must be introduced before cross-examination about revealing omissions may be conducted; *Doyle* applies only when the suspect invokes his federal right to remain silent, which Johnson did not.

The state discovery violation has presented a complication of a different sort for this proceeding, however. All we have is the offer of proof. The full statement to the Assistant State's Attorney is not in the record—by which we mean, not in the *federal* record. And the absence of the statement makes it difficult to apply *Doyle*. When, precisely, did Johnson receive *Miranda* warnings? (*Doyle* applies only to post-warning statements or omissions. See *Fletcher v. Weir*, 455 U.S. 603 (1982).) Was Johnson really silent about White's role? We don't know. What, if anything, did he say about how he came to have part of the $20 bill? We don't know. Did he say anything about how White could have carried a sawed-off shotgun without his knowledge? We don't know.

Unless *Charles* means that a defendant who says *anything* may be cross-examined about his failure to tell the whole story, the absence of the full statement impedes evaluation. And it is hard to think that the Supreme Court meant to say that, if a suspect tells a knock-knock joke after receiving *Miranda* warnings, and then clams up, *Doyle* drops out of the picture. The suspect must say enough to make the omission of the story told at trial a sound basis for an adverse inference. We just don't know whether that is true of the difference between Johnson's statement to the Assistant State's Attorney and his testimony at trial. For all the record shows, Johnson chatted amiably until the Assistant State's Attorney asked about the robbery, after which he invoked his right to silence.

Normally the prisoner bears the burden of production and the risk of non-persuasion in a federal collateral attack; after all, the petitioner is contesting a final decision of a state court. But the fact that the state's appellate court ruled in Johnson's favor on the *Doyle* issue may have led him to think it unnecessary to mount a full presentation in the federal proceeding. What's more, we do not know whether Johnson (or his lawyers) ever received a copy of the full statement. It is the Attorney General of Illinois who wants to contest the state judiciary's resolution of the *Doyle* question—yet the Attorney General did not furnish the federal court with a complete copy of Johnson's statement. Under the circumstances, it is best to proceed as the state court did: To assume that *Doyle* barred at least some of the 15 questions to which objections were overruled, and to ask whether the error was harmless.

The harmless-error question has some difficulties of its own. The first is the standard of federal review. Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

How does this language apply when the state court has found a violation of the Constitution but concluded that the error was harmless? One approach, which the district court used in reliance on *Fry v. Pliler*, 551 U.S. 112 (2007), is to tackle the issue independently, using the standard laid down in *Brecht*: Whether the *Doyle* violation "had substantial and injurious effect or influence in determining the jury's verdict." The other possible approach is to ask whether the state court applied federal law unreasonably when holding that the error was harmless beyond a reasonable doubt. See *Mitchell v. Esparza*, 540 U.S. 12 (2003). The reasonable-doubt standard is the right one on direct appeal, see *Chapman v. California*,

386 U.S. 18 (1967), just as the substantial-effect standard is appropriate on collateral review.

*Esparza* holds that, when a state court has found a constitutional error harmless beyond a reasonable doubt, the federal court's initial question is whether that decision represents an "unreasonable application of clearly established Federal law". The Justices wrote: "We may not grant [a] habeas petition . . . if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [State] Court of Appeals applied harmless-error review in an 'objectively unreasonable' manner." 540 U.S. at 18.

The district court did not mention *Esparza*. It relied on *Fry* for the proposition that a federal court should make an independent decision (though under the *Brecht* standard rather than the reasonable-doubt standard). The question at issue in *Fry*, however, was not whether a federal court should disregard a state court's considered decision on the subject of harmless error. It was instead what a federal court should do if the state court concludes that no constitutional error occurred and therefore does not make a harmless-error decision. If the federal court concludes that constitutional error took place, and the last state court to address the case did not apply any kind of harmless-error review, which is the appropriate standard: *Brecht* or *Chapman*? The Court held that *Brecht* supplies the standard for a federal court to use in all collateral attacks, when making an independent evaluation of a trial error's effects.

*Fry* did not overrule *Esparza*. To the contrary, the Justices wrote, "[i]n *Mitchell* v. *Esparza*, 540 U.S. 12 (2003) (per curiam), we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under §2254 unless the harmlessness determination itself was unreasonable. Petitioner contends that §2254(d)(1), as interpreted in *Esparza*, eliminates the requirement that a petitioner also satisfy *Brecht*'s standard. We think not." 551 U.S. at 119.

If the state court has conducted a harmless-error analysis, the federal court must decide whether that analysis was a reasonable application of the *Chapman* standard. If the answer is yes, then the federal case is over and no collateral relief issues. That's the holding of *Esparza*. If the answer is no—either because the state court never conducted a harmless-error analysis, or because it applied *Chapman* unreasonably—then §2254(d) drops out of the picture and the federal court must make an independent decision, just as if the state court had never addressed the subject at all. And we know from *Fry* that, when this is so, a federal court must apply the *Brecht* standard to determine whether the error was harmless. See also, e.g., *Smiley v. Thurmer*, 542 F.3d 574, 583–84 (7th Cir. 2008); *Aleman v. Sternes*, 320 F.3d 687 (7th Cir. 2003).

So did the state's appellate court analyze the harmless-error question reasonably? Because its opinion is unpublished (and not available on the Internet), we reproduce the pertinent portion here:

Before a constitutional error can be held harmless, the reviewing court must be able to conclude beyond a reasonable doubt that the error did not contribute to the finding of guilt. *People v. Averhart*, 311 Ill. App. 3d 492, 505–06, 724 N.E.2d 154 (1999) citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710–11 (1967). The burden of proof is on the State to show beyond a reasonable doubt that the jury verdict would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 363, 786 N.E.2d 1019 (2003).

There are five factors courts consider in determining whether a *Doyle* violation is harmless beyond a reasonable doubt: (1) the intensity and frequency of the references to the defendant's silence; (2) which party elected to pursue the line of questioning; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a motion for mistrial or to give a curative jury instruction; and (5) the quantum of other evidence establishing defendant's guilt. *People v. Dameron*, 196 Ill. 2d 156, 164, 751 N.E.2d 1111 (2001).

In light of the overwhelming quantum of evidence of defendant's guilt as established from the eye-witness identification testimony, we conclude that the *Doyle* violation was harmless beyond a reasonable doubt. Defendant was identified by two eyewitnesses whose identifications were reliable.

Factors that are considered in determining the reliability of an out-of-court identification include

the witness's opportunity to view the accused at the time the crime occurred, the witness's degree of attention, the accuracy of the witness's prior description, the degree of certainty demonstrated by the witness at the subsequent confrontation, and the amount of time that passes between the crime and the confrontation. *People v. Taylor*, 143 Ill. App. 3d 252, 255, 492 N.E.2d 1011 (1986). In this case, the armed robbery occurred in a fully illuminated restaurant with the offender in close proximity to the eyewitnesses, making no attempt to conceal his identity. Moreover, the armed robbery lasted approximately ten minutes, during which time the offender ordered Susanna Ramos to open her cash register and moments later ordered the manager, Alicia Ortega, to sequentially open four cash registers.

The record indicates that Monique Nolan and Susanna Ramos both had sufficient opportunity to observe the offender during the armed robbery and both were paying attention. Nolan testified that during the armed robbery she stood only five to six feet away from the offender and that she continually looked and peeked at the offender from a corner of the employee area of the restaurant. Ramos testified that when the offender first approached her at the front counter, she looked him in the face and asked for his order. According to Ramos, the offender stood at the front counter for about a minute without responding and then walked away. Minutes later, the offender returned

to the counter where he pointed a sawed-off shot-gun at Ramos' chest and demanded that she open her cash register. Ramos testified that at this time the shotgun actually touched her chest and she looked directly at the offender's face for one to two minutes before turning away because she was frightened.

Defendant argues that Nolan's and Ramos' failure to describe his facial hair rendered their identifications unreliable. We disagree. "Experience tells us that an identification is not usually made by distinguishing separate features but by the total impression made upon the witness." *People v. Smith*, 52 Ill. App. 3d 583, 587, 367 N.E.2d 756 (1977). Thus, courts have generally held that an eyewitness's failure to include facial hair in an initial description constitutes a minor discrepancy, affecting the credibility of the description, but not destroying the validity of the identification testimony. *Taylor*, 143 Ill. App. 3d at 255. Under the circumstances of this case, Nolan's and Ramos' failure to describe defendant's facial hair in their initial description of defendant did not render their identification testimony unreliable.

Therefore, we find that in light of the overwhelming quantum of evidence of defendant's guilt as established from the eyewitness identification testimony, the *Doyle* violation was harmless beyond a reasonable doubt. We are convinced that the jury would have convicted defendant

absent the prosecutor's improper reference to defendant's post-*Miranda* silence.

This passage articulates the *Chapman* rule accurately, and it reads like a reasonable application. It is in some respects favorable to Johnson—it recognizes a weakness in the eyewitness testimony, and it does not rely on anything that White said, the torn $20 bill, the fact that the manager of the Trak Auto store testified that Johnson displayed a wad of crumpled bills, or the sawed-off shotgun and loot found in his car.

Johnson contends that Nolan and Ramos gave testimony at odds with that of White, who said that the robbery started soon after they entered the restaurant, rather than a few minutes later. Disagreements about time are common in eyewitness testimony; a few minutes may seem like much longer to someone staring at the barrel of a sawed-off shotgun. It is almost always possible to find inconsistencies in the narrations of multiple eyewitnesses, and incongruities in the story of any one eyewitness. The shortcomings of human observation and memory do not make it unreasonable for a state court to find an error harmless beyond a reasonable doubt. Questions that violate *Doyle*'s rule are unlikely to change a jury's mind. These questions do not get damning evidence before the jury, and "why didn't you tell this story before?" is something that jurors are likely to wonder, whether or not a prosecutor makes the question explicit.

Perhaps we would have reached a different conclusion, had we been faced with the harmless-error question in

a case on direct appeal in federal court. But whether the state court erred (in the sense that federal judges would have decided otherwise) does not matter under §2254(d). We ask only whether the state court's resolution was reasonable. This considered conclusion was reasonable, so the state court's decision must stand.

REVERSED

CUDAHY, *Circuit Judge*, concurring.  The district court, after what seems to me to be a searching analysis under *Brecht*, reached a point where it was in "grave doubt" about the harmlessness of the *Doyle* error in Johnson's state court trial and, citing *Fry v. Pliler*, resolved its state of "equipoise" by granting the habeas petition. *See Fry v. Pliler*, 127 S. Ct. 2321, 2328 n.3 (2009) ("We have previously held that, when a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict . . . .'") (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

The majority resolves the question of the harmlessness of the *Doyle* violation by finding that the state court applied settled law reasonably under § 2254(d), and therefore does not reach the *Fry/Brecht* question. This seems unsettling because it points to tension between our precedent regarding "reasonableness" under § 2254(d)

and the Supreme Court's precedent on how to resolve questions of harmlessness under *Brecht*. In the end, I believe the legal gymnastics can, perhaps, be reduced to a difference of opinion about the effect of the error in question. The district court judge was convinced that the *Doyle* error made a difference in the outcome of Johnson's trial (or he had grave doubts, anyway). The majority on appeal believes that a *Doyle* violation rarely, if ever, makes this kind of a difference and that the state court was therefore reasonable in finding it made no difference here.

Because habeas petitions are subject to de novo review, the majority analysis results in a reversal. But the majority does little to clarify how district courts are to apply § 2254(d)'s "reasonableness" inquiry in the light of *Fry*'s instruction to "assess the prejudicial impact of constitutional error in a state-court criminal trial under the . . . standard set forth in *Brecht*," and apparently to grant the petition where "grave doubts" lead to a state of "equipoise." *Fry*, 127 S. Ct. at 2328 & n.3. Although these complications are troubling, I do not find them adequate grounds to disagree with the outcome and therefore I join the majority opinion.