In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3365

JOHN ASHBURN,

*Petitioner-Appellant,*

*v.*

JEFF KORTE, Warden[*],

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 09-CV-0373 — **David R. Herndon**, *Chief Judge.*

ARGUED JANUARY 22, 2014 — DECIDED AUGUST 1, 2014

Before WOOD, *Chief Judge,* and MANION and WILLIAMS,
*Circuit Judges.*

MANION, *Circuit Judge.* John Ashburn was convicted in
Illinois state court of the first degree murder of Rick

---

[*] We substitute Jeff Korte, the current warden of Western Illinois Correctional Center, as the Respondent-Appellee in this action. *See* Fed. R. App. P. 43(c)(2).

Muckenstrum. After appealing his conviction and filing a collateral challenge in Illinois state court, Ashburn filed a habeas corpus petition in federal district court. The district court denied Ashburn's petition for habeas relief but certified six issues for appeal. Ashburn now appeals, presenting four of those issues: whether Ashburn's constitutional right to effective assistance of counsel was violated because his state appellate counsel did not raise a speedy trial claim; whether Ashburn was denied due process because of the admission of a knife unrelated to the murder; whether Ashburn was denied due process because of the state's purported use of perjured testimony; and whether Ashburn was denied due process by the giving of an accountability instruction to the jury. We affirm.

## I.

An Illinois state jury convicted John Ashburn of the first degree murder of Rick Muckenstrum. The jury which convicted Ashburn heard the following testimony[1]. Muckenstrum's live-in girlfriend of nine years, Melanie Collins, testified that in late June or early July 1990, Muckenstrum, Ashburn, and several other people went on a camping trip to Missouri. Ashburn had loaned Muckenstrum the money for the trip, $37, but once at the campsite, and after everyone had been drinking for a while, Ashburn began to argue with Muckenstrum. Collins and Muckenstrum decided

---

[1]   We take these facts from the Illinois appellate court decision affirming Ashburn's conviction, which are presumed to be correct. *Harris v. Thompson*, 698 F.3d 609, 613 (7th Cir. 2012).

to leave, and after the couple got into her car, Ashburn yelled at Muckenstrum to get out of the car or he would kill him. He also broke the passenger-side window where Muckenstrum was sitting.

Collins further testified that, a few days after the camping trip, Ashburn came to their apartment looking for Muckenstrum. Ashburn kicked in the front door and told Collins he wanted her "old man" and that he was going to kill Muckenstrum.

Collins last saw Muckenstrum on July 10, 1990, when he left to go drinking with Bobbie Johnston, Pete Parker, and Dave Clark. Muckenstrum's dead body was found the next day, July 11, 1990, at about 3 p.m., lying in the grass next to a gravel road. Dr. Harry Parks, a forensic pathologist, performed an autopsy on Muckenstrum on July 12, 1990. During the autopsy, Dr. Parks removed a bullet from Muckenstrum's head. Dr. Parks testified that the bullet wound was above Muckenstrum's right eye and that there was blackening around the gunshot wound, indicating that the bullet had been fired at close range. Dr. Parks noted that he found very little blood and that this lack of blood indicated that Muckenstrum did not live long after the gunshot wound to the brain. In addition to the gunshot wound, there was a half-inch stab wound on the right side of his neck, and a 5.5 inch slash wound in the upper portion of his abdomen, which allowed his colon to protrude. Dr. Parks testified that although the immediate cause of death was the gunshot wound, he was unable to determine with medical certainty whether Muckenstrum had been shot or stabbed first. Finally, Dr. Parks testified that Muckenstrum had no defensive wounds and that a toxicology

report concluded that Muckenstrum's blood-alcohol level was .4366 at the time of his death.

Dee Heil, a crime scene technician for the Illinois State Police, also testified concerning the crime scene. He arrived at the scene at about 3:30 p.m. on July 11, 1990. Heil found a red plastic identification holder on the ground by Muckstrum's dead body. Inside the identification holder were two union cards, two fishing licenses (for 1989 and 1990), and a 1989 hunting license, all of which bore Ashburn's name. (There were also two business cards in the identification holder.) Heil also attended Muckstrum's autopsy and took custody of the bullet removed from Muckenstrum's head. He took the bullet to the Illinois State Police Crime Lab, where James Hall, a forensic scientist, examined the bullet. Hall determined that the bullet was a .32-caliber bullet which had been fired from a Davis Industries Derringer or pistol.

Hall also served a search warrant on Ashburn's home and during the search recovered a knife and a knife box for a new knife which had a sales receipt dated July 14, 1990. These items were admitted into evidence at Ashburn's trial. Two other investigating officers also testified: Clarence Banks, an investigator for the Illinois State Police, corroborated the earlier testimony concerning the recovery of the identification holder found by Muckenstrum's body. Illinois State Police Officer Robin Blaha testified that he, Banks, and Donald Leach, another State Police officer, went to Ashburn's home on July 12, 1990. When Ashburn answered the door, Blaha told them they needed to talk to him about an investigation involving Muckenstrum. Blaha asked Ashburn when he last saw Muckenstrum, and Ashburn said it was two weeks earlier on

a camping trip. After Blaha told Ashburn that he had been seen with Muckenstrum a couple of nights earlier, Ashburn said that he had been drinking with Muckenstrum but had forgotten.

The state presented numerous other witnesses. One witness, Deanne Hinchcliffe, testified concerning the camping trip and corroborated Collins's testimony about the argument between Ashburn and Muckenstrum. She also testified that during that argument, Ashburn had pulled a knife on Muckenstrum. Brian Smith, who had also been on the camping trip, likewise corroborated the testimony about the altercation between Ashburn and Muckenstrum. Additionally, Smith testified that on July 10, 1990, he drove Ashburn to Missouri where Ashburn purchased some .32-caliber bullets. Smith also saw a gun in Ashburn's glove compartment that day.

Other witnesses helped fill in the blanks between when Collins last saw Muckenstrum on July 10, and the recovery of Muckenstrum's body. Parker, who had left Collins's apartment with Muckenstrum sometime between 9 and 10 a.m., testified that after having some beers at Collins's, they went to several bars, ending up at Jimmy's Tavern. At Jimmy's Tavern, they ran into Ashburn, who was drinking there. Ashburn and Muckenstrum began arguing over the money that Muckenstrum owed Ashburn, and Parker told them to go outside and settle the argument "like men." Parker testified that, as he and Muckenstrum were walking by the back of the bar, Ashburn came running around the corner with a .32-caliber Derringer in his hand. Parker explained that he stood between the two, at which time Ashburn fired the weapon between Parker's legs. Clark then came up behind Ashburn,

took the gun, unloaded  it and gave it back to Ashburn. Ashburn then said that was okay because he had more bullets. Some shoving and pushing then transpired before everyone went back inside. About 4:30 p.m., Muckenstrum left Jimmy's Tavern with Ashburn and Clark in Ashburn's truck. That was the last time Parker saw Muckenstrum alive. Another witness, Michael Hendrix, corroborated Parker's testimony concerning the events at Jimmy's Tavern.

Richard Aulabaugh, who owned a bar called The Bar, testified that on July 10, 1990, he noticed Ashburn, Clark, and Muckenstrum in the bar arguing. Aulabaugh testified that he heard Ashburn and Muckenstrum discussing money and Ashburn told Muckenstrum that he had a full tank of gas and they were going to drive around until Muckenstrum got him his money. Sharon Russell, who worked at The Bar, testified as well, stating that Ashburn was arguing with Muckenstrum about $37 that Muckenstrum owed Ashburn. Because of complaints from other customers, Russell asked them to quiet down and then after ten to fifteen minutes, told them to leave. After they left, Russell saw Muckenstrum sitting in the middle of a truck which Ashburn was driving; Clark was in the passenger seat. Aulabaugh also testified that he saw the three men leave the bar and enter the truck, with Muckenstrum getting in the middle and Clark sitting on the passenger side, whereupon Ashburn closed the passenger door and then got in the driver's seat. Aulabaugh said that Ashburn continued to argue with Muckenstrum and was shaking his finger at him in the truck. It was about 4:30–5:00 p.m. when they left The Bar.

At trial, Russell also viewed a photograph of Muckenstrum's body. She testified that when she saw

Muckenstrum at The Bar, he was wearing a yellow tank top and a pair of jeans. After looking at the photograph of Muckenstrum's body, she stated that the clothing he had on at the time of his death was the same as he had had on earlier at The Bar.

Janice Walker was another state's witness. Walker testified that she had rented Clark a room two weeks before Muckenstrum's death. A day or two after the murder, Clark and Ashburn came to her home in Ashburn's pickup truck to get Clark's clothing. Walker noticed that Ashburn's truck was wet, both inside and outside, which indicated to her that the truck had recently been washed. Smith, who had testified about other events surrounding the murder, also testified that he had never seen Ashburn clean his truck, from the time he had bought it until July 10, 1990.

Finally, Earl Patrick Kelly testified that Ashburn told him that he had killed Muckenstrum. Kelly testified that Ashburn told him that he had argued with Muckenstrum over money and that after they left a bar, they were riding around. Kelly said that Ashburn told him that "the other guy stabbed him in the stomach, and then they took him to Brooklyn and dropped him off in a field and Clark told Ashburn to shoot him so he couldn't tell on him." (Brooklyn, Illinois was where Muckenstrum's body was found.) Kelly further testified that Ashburn told him that he shot Muckenstrum "in the eye" and that he had lost his fishing license when they disposed of the body. During cross-examination, Kelly admitted that he knew Muckenstrum and that he had been convicted of burglary. Kelly also admitted that he did not tell authorities about

Ashburn's confession until a few months before he was to be sentenced in federal court.

A state court jury convicted Ashburn and he was sentenced to seventy-five years in prison.[2] Ashburn appealed his conviction, arguing to the state appellate court that he was denied a fair trial when evidence of the knife, knife box, and receipt recovered from his home were admitted at his trial. The state appellate court affirmed and the Illinois Supreme Court denied his petition for leave to appeal. Ashburn then filed a state postconviction petition, alleging that his appellate attorney was ineffective for not raising a speedy trial claim. He also argued that he was denied due process because Dr. Parks falsely testified at his trial, and that he was denied due process because the jury was instructed that it could convict him based on a theory of accountability. The state trial court denied the petition and the appellate court affirmed the denial of postconviction relief.

Ashburn then filed a habeas corpus petition pursuant to 28 U.S.C. § 2254. His petition raised seven claims. The district court denied him habeas relief and granted a certificate of appealability on six of the seven claims. This court then granted Ashburn's motion to amend the certificate of appealability to remove two of the six certified claims, leaving the four claims for habeas relief Ashburn now presents to this court. Specifically, Ashburn argues that he was denied: 1) effective assistance of appellate counsel by his attorney's

---

[2]   In a separate jury trial, Clark was also convicted of Muckenstrum's murder.

failure to raise a speedy trial claim; 2) his right to due process by the introduction at his trial of the knife, knife box, and receipt recovered from his home; 3) his right to due process by the admission of the purportedly perjured testimony given by pathologist Dr. Parks; and 4) his right to due process by the giving of a jury instruction on accountability.

## II.

### A.  Speedy Trial Claim

On appeal, Ashburn first argues that he is entitled to habeas relief because his appellate counsel was ineffective for not arguing on direct appeal that his federal constitutional right to a speedy trial was violated. To understand this claim, some additional facts are needed:

On June 18, 1993, a grand jury returned an indictment charging Ashburn with first degree murder "in that he, without lawful justification and with the intent to kill or do great bodily harm to [Muckenstrum], shot … Muckenstrum with a firearm and stabbed him with a knife, thereby causing [his] death."[3] At the time the indictment was returned, Ashburn was a prisoner at the Graham Correctional Center in

---

[3] The nearly three-year delay between the murder and the indictment is not explained, although Ashburn's attorney notes that on October 26, 1990, a grand jury found "no true bill" against Ashburn on a charge of first degree murder and the charge was dismissed. A newspaper article published at the time of the underlying trial indicated the delay was caused because Ashburn had threatened witnesses. Ashburn had sought a mistrial based on the publication of that newspaper article (which contained other derogatory information), but the motion was denied and Ashburn does not present that issue in his habeas petition.

Hillsboro, Illinois, serving a thirteen-year sentence for a 1991 state conviction for unlawful possession of a weapon. On June 22, 1993, Ashburn was served with an arrest warrant for Muckenstrum's murder. On December 3, 1993, Ashburn was arraigned and counsel was appointed to represent him.

At his arraignment, Ashburn stated that his statutory speedy trial rights had been violated because more than 120 days had elapsed since his arrest. The state court told Ashburn to address that issue with his counsel. On February 23, 1994, Ashburn's attorney filed a petition seeking discharge under Illinois statute 725 ILCS 5/103-5(a) (1994) because more than 120 days had passed since his arrest. On March 8, 1994, following a hearing at which the state announced it was ready for trial, the trial court denied Ashburn's petition because Ashburn had not demanded a speedy trial, as mandated by 725 ILCS 5/103-5(b) and 730 ILCS 5/3-8-10. Those sections govern the speedy trial rights of individuals incarcerated in the Department of Corrections on unrelated charges and grants a right to a trial within 160 days of a written demand for a speedy trial (which includes specific information).

Ashburn then moved to continue the trial and the court granted that motion, continuing trial until April 5, 1994. Ashburn requested a further continuance, which moved the trial date to May 3, 1994. Then on May 3, 1994, on Ashburn's motion, trial was again continued until June 13, 1994. The state then requested its only continuance, moving the trial date from June 13 to July 5.

During these delays, Ashburn sent a letter dated April 20, 1994, to the trial court. That letter stated that he had informed

his trial counsel of his "extreme objections to the manner in which the case [was] being (actually, not being) pursued," and had complained of a "humongous dearth of communication" and an "inability to detect any tangible performance or preparation on his part for trial." Ashburn's letter concluded: "This preliminary ineffective assistance of counsel cannot be permitted to perdure [sic]." Ashburn sent a second letter to the state court on June 7, 1994, complaining that his attorney had not communicated with him and asking the court for a status update on his case. A week later, Ashburn filed a third letter with the court, claiming his attorney had not responded to his letters nor evidenced any preparation for his case. Ashburn requested that the trial court ask his attorney "if he wishes to remain on the case," and to consult with him "to prepare a competent defense" and "to amicably resolve this situation or ask to be relieved."

On July 5, 1994, the scheduled trial date, a new attorney appeared on Ashburn's behalf and moved for a continuance until after September 1, 1994. But at the same time, the second attorney filed a speedy trial demand. Ashburn's second attorney then filed several additional requests for continuances, which were granted until, finally, a jury trial began on February 14, 1995.

Ashburn asserts that he is entitled to habeas relief because his appellate counsel was ineffective for not arguing on direct appeal that the delay between his June 18, 1993, indictment and the commencement of his February 14, 1995, trial violated his federal constitutional right to a speedy trial. The government responds that Ashburn procedurally defaulted and forfeited this claim because, before the state court and in his habeas

petition, Ashburn had only argued ineffective assistance premised on his appellate attorney's failure to argue a state statutory speedy trial claim. We need not resolve this close question because, as discussed shortly, an ineffective assistance claim premised on the failure of Ashburn's appellate attorney to argue a federal constitutional speedy trial violation lacks merit. *See Bland v. Hardy*, 672 F.3d 445, 451 (7th Cir. 2012) (concluding that this court "need not decide whether [the defendant] has committed a procedural default, because his argument fails on the merits"); 28 U.S.C. § 2254(b)(2).

First, though, is the question of our standard of review. When a habeas petitioner seeks relief from a state conviction, great deference is afforded to the state court's analysis of *Strickland's* cause and prejudice prongs. *Brady v. Pfister*, 711 F.3d 818, 823–25 (7th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Such deference is granted even where the state court denies relief, "without an accompanying statement of reasons." *Id.* at 825 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011)). In other words, when "the state court does not articulate the rationale for its decision, our review is no less deferential than it is when we review a detailed state court analysis of a petitioner's claim." *Hartman v. Lee*, 283 F.3d 190, 194 (4th Cir. 2002). In that case, though, "the procedure differs slightly: We must conduct an independent review of the record and the applicable law to determine whether the *result* reached by the state court 'contravenes or unreasonably applies clearly established federal law.'" *Id*. (citing *Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir. 2000) (en banc)). However, deference is only afforded to cases "adjudicated on the merits in State court proceedings." *Harris*, 698 F.3d at 623. "Where the state courts

did not reach a federal constitutional issue, 'the claim is reviewed *de novo*.'" *Id.* (quoting *Cone v. Bell,* 556 U.S. 449, 472 (2009)).

The difficulty, then, is determining whether a state court adjudicated a federal constitutional claim on the merits when it did not discuss that claim. The Supreme Court has held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784–85. But this "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

Following *Richter*, the Supreme Court in *Johnson v. Williams*, 133 S. Ct. 1088 (2013), "suggested several ways in which a petitioner might rebut the presumption: if the state court relies exclusively on state law, and the state standard is less protective than the federal one, rebuttal could occur; or the governing federal standard might simply have been 'mentioned in passing in a footnote or [been] buried in a string cite.'" *Brady*, 711 F.3d at 825 (quoting *Williams*, 133 S. Ct. at 1096). Additionally, "[i]f a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right or wrong of the matter," *Id.* (quoting *Williams*, 133 S. Ct. at 1097), and thus that claim has not be evaluated on the merits. In such cases, "either the petitioner might rebut the presumption and show that the federal court should review the claim *de novo,* or the state might rebut the presumption and show that the federal claim was procedurally defaulted." *Id*.

This case seems to fit one the scenario in which the presumption is overcome because the state court, in rejecting Ashburn's ineffective assistance of counsel claim, relied solely on the Illinois Speedy Trial Act and made no mention of the federal constitutional right to a speedy trial. It could have been inadvertence, in which case the state court's decision was not on the merits "and thus does not satisfy the requirements of Section 2254(d)," making our review *de novo*. *Brady*, 711 F.3d at 825. Or it might be the state court did not address the merits of an ineffective assistance of counsel claim premised on a federal constitutional right to a speedy trial because Ashburn did not present this claim to the state court, and thus he procedurally defaulted the claim. But again, we need not decide whether Ashburn procedurally defaulted his claim because even under *de novo* review, Ashburn cannot prevail. Accordingly, we turn to the merits of Ashburn's ineffective assistance of counsel claim premised on his appellate attorney failing to argue a violation of his federal constitutional right to a speedy trial.[4] We will address this question *de novo*, applying pre-AEDPA standards. *Id.* at 827. "If the record as a whole supports the state court's outcome, then even under *de novo* review the correct result would be to deny the petition for a writ of *habeas corpus*." *Id.*

To prevail on his ineffective assistance of appellate counsel claim, Ashburn must demonstrate that his appellate attorney

---

[4]   Ashburn does not argue on appeal that his appellate counsel was ineffective for failing to argue a statutory speedy trial claim. Therefore, we focus solely on the question of whether his appellate counsel was ineffective for failing to argue a federal constitutional speedy trial claim.

provided deficient assistance and that prejudice resulted. *Strickland,* 466 U.S. at 687. Without a meritorious speedy trial claim, Ashburn cannot possibly demonstrate that he was prejudiced by his appellate counsel's failure to argue such a claim. "As the Court noted in *Strickland*, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Morgan v. Hardy*, 662 F.3d 790, 802 (7th Cir. 2011) (quoting *Strickland*, 466 U.S. at 697).

The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), set forth the now well-established standard governing Sixth Amendment speedy trial challenges. That four-part test considers: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *United States v. White*, 443 F.3d 582, 589 (7th Cir. 2006) (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)).

"The first factor, the length of delay, acts as a triggering mechanism; unless a presumptively prejudicial amount of time elapsed in the district court, it is unnecessary to conduct a searching analysis of all the factors. " *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007). In this case, Ashburn was indicted on June 18, 1993, but trial did not begin until February 14, 1995. "We have considered delays that approach one year presumptively prejudicial." *Id.; see also Doggett*, 505 U.S. at 652 n.1. Because more than one year passed from Ashburn's indictment to trial, a full review of the *Barker* factors is appropriate. "In determining the weight to give the length of the

delay, we must look to the extent to which it exceeds the minimum necessary to trigger the analysis." *Oriedo*, 498 F.3d at 597. Here the total delay of 20 months exceeded a year, but not extraordinarily so, so this factor only weighs moderately in Ashburn's favor.

But the second *Barker* factor—the reason for the delay—not only weighs against Ashburn; it rebuts the presumption of prejudice flowing from the total 20-month delay. That is because, while the total time from Ashburn's indictment until his trial was 20 months, at most the government was responsible for not quite nine months of that delay. The government was clearly responsible for the initial five-and-a-half month delay from Ashburn's June 18, 1993, indictment until his arraignment on December 3, 1993. But on March 8, 1994, the state declared itself ready for trial. It is unclear the entire reason for the three-month delay between December and March 8, but a half-month of that time was due to Ashburn filing on February 23, 1994, a motion to dismiss the indictment under the Illinois Speedy Trial Act. That motion was denied because Ashburn had failed to file a written demand for trial, as required by the Illinois statutes. The delay related to Ashburn's unsuccessful motion is not attributable to the state. *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 808–09 (7th Cir. 1984). The state also requested one short continuance which delayed trial from June 13 until July 5. Together, these delays attributable to the state totaled not even nine months.

Conversely, Ashburn's defense attorneys requested at least six continuances. After his motion for discharge was denied on March, 8, 1994, Ashburn's first attorney moved to continue the trial, and trial was continued until April 5, 1994. Ashburn's

attorney later requested a second continuance, which moved the trial date to May 3, 1994. Then on May 3, 1994, on motion by Ashburn's attorney, trial was again continued until June 13, 1994. As noted above, the government then requested a continuance, which moved the trial date to July 5, 1994. On the July 5, 1994, trial date, James E. Wallis appeared on Ashburn's behalf as a retained counsel. Wallis moved to continue trial to a date after September 1, 1994. Trial was continued until August 2, 1994. Wallis then filed additional requests to continue the trial, until the jury trial began on February 14, 1995. The continuances requested by Ashburn's attorneys thus delayed trial by approximately ten to eleven months, making Ashburn more responsible than the state for the twenty-month delay.

Ashburn argues in response that the continuances requested by his first attorney—from March 8, 1994 until June 13, 1994—should be not attributable to him because his first attorney did not communicate with him during that time. However, because "the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation," delay caused by the defendant's counsel is also charged against the defendant. *Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009). Ashburn suggests that this general rule should not apply under the circumstances of his case—where his attorney failed to communicate with him concerning continuances. But even were we to hold that this time was not attributable to Ashburn—something we do not do—the delay cannot be attributable to the government. "An assigned counsel's failure 'to move the case forward' does not warrant attribution of delay to the State." *Id.* at 92. Thus, as explained above, the

delay attributable to the state totaled less than nine months. A nine-month delay would not even trigger the *Barker* analysis in the first place, and thus, that the government was only responsible for that length of the total twenty-month delay, weighs in the state's favor.

The third *Barker* factor considers whether the defendant asserted his right to a speedy trial. Ashburn clearly requested a speedy trial at his arraignment and in later motions to dismiss. But at the same time, Ashburn requested numerous continuances which further delayed trial. In *Oriedo*, 498 F.3d 593, this court considered a similar situation. There, the defendant stated in April 2004 that he opposed all continuances, and six months later he indicated that he wished to proceed to trial. *Id.* at 600. However, the defendant later sought numerous continuances. *Id.* This court held that "[g]iven this sequence of events, we cannot say that this factor weighs in favor of Mr. Oriedo." *Id.* Similarly, in this case, given the numerous continuances requested by Ashburn, the third *Barker* factor does not weigh in his favor.

The fourth and final *Barker* factor considers the prejudice to the defendant. Here we must consider the "circumstances of this case in light of the interests the right is intended to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that defense will be impaired.'" *Id.* (citing *Barker,* 407 U.S. at 532) (internal quotation marks omitted). "Actual prejudice to the defense is the 'most serious' concern raised by a delay because it may 'skew[ ] the fairness of the entire system.'" *Oriedo*, 498 F.3d at 600 (quoting *Doggett*, 505 U.S. at 654).

In this case, the delay did not cause Ashburn any pretrial incarceration because Ashburn was already in prison for another offense. Thus, while Ashburn argues on appeal that "[w]here a defendant is incarcerated during delay, like Mr. Ashburn, 'he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense,'" it was not the delay which caused this prejudice. Ashburn also does not claim any actual prejudice to his defense. In fact, the government claims that the delay, if anything, harmed its case because one of the witnesses (an individual who had found the body), died prior to trial. Ashburn, though, can validly claim anxiety and concern over the pending charges. But that is not enough to find a constitutional speedy trial violation. Rather, if there is no actual prejudice, the presumed prejudice flowing from a long delay is "insufficient to carry a speedy trial claim absent a strong showing on the other *Barker* factors." *Oriedo*, 498 F.3d at 600. This case does not present even a weak showing on the other *Barker* factors:   Ashburn was as much, if not more, responsible for the pretrial delay; while Ashburn asserted his speedy trial rights, he also continued to request continuances; and the delay did not cause any pretrial incarceration and did not impair his defense. Under these circumstances, Ashburn was not denied his Sixth Amendment right to a speedy trial. *See Oriedo*, 498 F.3d at 601 (holding the defendant did not demonstrate a denial of his Sixth Amendment right to a speedy trial, where, even though the delay was substantial and the defendant was detained pretrial for three years, the fault for the delay was shared and the defendant continued to request continuances following his assertion for the right to a speedy trial); *Loera v. United States*, 714 F.3d 1025,

1032 (7th Cir. 2013) (holding that a 19-month delay between indictment and trial did not violate the constitutional right to a speedy trial). Because Ashburn was not denied his Sixth Amendment right to a speedy trial, he cannot show any prejudice from his state appellate attorney's failure to argue such a claim. Accordingly, his ineffective assistance of counsel claim premised on that omission fails.

### B. Knife Evidence

Ashburn next argues that he is entitled to habeas relief because the state trial court's admission of irrelevant evidence (a knife, an empty knife box, and a receipt for the purchase of a knife) was so prejudicial that it denied him his Fourteenth Amendment right to due process. The Illinois appellate court found this evidence irrelevant and prejudicial, but concluded that any error was harmless because of the overwhelming evidence against Ashburn.

Once again, the state and Ashburn wrangle over whether Ashburn procedurally defaulted and forfeited this claim. The state maintains that Ashburn procedurally defaulted this claim because he merely presented an evidentiary challenge to the state court, not a federal due process claim. The state also claims he forfeited the claim because he did not specify the due process violation in his federal habeas petition. However, as before, there is no need to wade into this dispute because, on the merits, Ashburn's due process claim fails as any error from the admission of this evidence was harmless.

"The harmless error question has some difficulties of its own. The first is the standard of federal review." *Johnson v. Acevedo*, 572 F.3d 398, 403 (7th Cir. 2009). Generally, "when a

state court has found a constitutional error harmless beyond a reasonable doubt, the federal court's initial question is whether that decision represents an 'unreasonable application of clearly established Federal law.'" *Id.* at 403–04 (quoting *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003)).

It is unclear, though, whether the state court in this case applied the federal constitutional standard for harmless error. The Supreme Court established the federal constitutional harmless error standard in *Chapman v. California*, 386 U.S. 18, 24 (1967). "Under *Chapman*, 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Kamlager v. Pollard*, 715 F.3d 1010, 1016 (7th Cir. 2013) (quoting *Chapman*, 386 U.S. at 24). In other words: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder v. United States*, 527 U.S. 1, 18 (1999).

However, in holding the knife evidence inadmissible and the error harmless, the Illinois Appellate Court merely said: "[T]he court abused its discretion in admitting this evidence. However, because the evidence against defendant was overwhelming, we find the error harmless and reversal is not mandated." From this discussion, it appears the state court was merely analyzing the question from the perspective of state evidentiary principles—not federal due process principles. Which again triggers the question of whether the state appellate court did not address a federal due process claim because Ashburn never presented one (and thus procedurally defaulted), or because of inadvertence or otherwise, such that the state court never ruled on the merits of Ashburn's federal due

process claim. If the state court never conducted the *Chapman* harmless error analysis, a "federal court must make an independent decision, just as if the state court had never addressed the subject at all." *Johnson*, 572 F.3d at 404. In that case, "a federal court must apply the *Brecht* standard to determine whether the error was harmless." *Id*. Under *Brecht*'s harmless error analysis, the question is whether the evidence "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Because, as discussed below, Ashburn loses under either standard, we assume the state court never addressed the merits of a properly presented due process claim and consider whether the knife evidence was harmless under *Brecht. See Jones v. Basinger*, 635 F.3d 1030, 1052 n.8 (7th Cir. 2011) (explaining that the *Brecht* analysis subsumes the *Chapman* analysis).

Ashburn argues that the knife evidence had a substantial and injurious effect on the jury's verdict because the government focused on the knife wounds in opening argument, promising the jury "[y]ou're going to see photographs of that where it is consistent with a knife, the knife was dragged across his chest and his chest is opened up." Ashburn also points to the government's closing argument, wherein it stated: "when you … take a knife and you basically degut this person, you intend to do two things, either to kill him or do greatly [sic] harm to him. This defendant is guilty." The State later added: "We know he's got knives. … Did he have knives in his house? Well, we found one. Where did you find it? In his house. Is that the murder weapon? Who knows for sure. It can be argued that it is." Ashburn argues that in light of these

comments, which obfuscated the fact that the knife admitted into evidence was not the murder weapon, the knife evidence was so prejudicial that it had a substantial and injurious effect on the jury's verdict.

We cannot agree. While the prosecutor noted that "it can be argued that it is" the knife, it never actually made that argument. Nor did the prosecutor focus on the knife recovered from his house in presenting the case against Ashburn; rather, the prosecutor made the one reference quoted above in the context of a closing statement which highlighted the substantial evidence of guilt. The empty knife box and receipt also did not have a substantial and injurious effect on the jury's verdict. Here, the prosecutor asserted in closing argument: "But there's something else in that house?  Something else that's very, very strange. There's a buck knife, cost about $39.00, and with that is a receipt for the total price of forty-two fifty-nine, and the date on it is July 14th. July 14th. Well, wait a minute, that's not the knife, that's after the murder. That's after the body is found. Well, isn't it another strange thing that the last person who [the victim] was seen with just so happens three days after the body is found goes out and buys a new knife. Why would he do that?  Possibly he lost a knife somewhere per chance."[5]

---

[5]  According to Ashburn, the knife admitted into evidence was an older knife and thus could not have been the one which went with the empty knife box. Ashburn argues that this distinction was noted in discussions with the judge concerning the admissibility of the knife evidence, outside of the jury's presence. Given that this distinction was not made to the jury, the jury might well have believed that the knife admitted into evidence was the one purchased after the crime, further negating any substantial and

(continued...)

This argument, even if improper, did not have a substantial and injurious effect on Ashburn's trial because the government did not rest its case—or even base its case—on the knife evidence. Rather, the government presented overwhelming evidence of Ashburn's guilt: Several witnesses testified to the initial argument at the campground. The jury also heard from Muckenstrum's girlfriend that Ashburn had kicked in the door to their home and threatened to kill Muckenstrum. The evening Muckenstrum disappeared, he was last seen with Ashburn, arguing with Ashburn, and Ashburn had shot his gun in the direction of Muckenstrum before leaving with him. Ashburn owned a gun of the same caliber as the murder weapon and had recently purchased bullets for the gun. Several identification cards bearing Ashburn's name were found next to the dead body. Ashburn also washed his truck shortly after the murder and when questioned by officers shortly after the murder, told them he had not seen Muckenstrum for a couple of weeks. And a government witness testified that Ashburn admitted to the crime, and told him several details that corresponded to the crime—such as that Clark had stabbed Muckenstrum and that he had shot him in the eye and that he had lost his identification cards when they disposed of the body in Brooklyn. In light of this overwhelming evidence, the knife evidence could not possibly have had a substantial and injurious effect on the jury's verdict. Accord-

---

[5] (...continued)

injurious effect from the admission of the knife. Our above analysis, however, assumes that the knife admitted into evidence was another knife (i.e., not the one matching the knife box and receipt) recovered from Ashburn's home.

ingly, the district court properly rejected Ashburn's due process claim premised on the admission of the knife evidence.

### C. Dr. Harry Parks's Testimony

Ashburn next argues that he is entitled to habeas relief because the state violated his due process rights by presenting the knowingly perjured testimony of Dr. Harry Parks. As noted above, Dr. Parks performed the autopsy on Muckenstrum. In addition to the details summarized above, at Ashburn's trial Dr. Parks also testified on cross-examination as follows:

Q. Doctor, did you make any conclusions or do any work with regard to estimating a time of death concerning this particular individual?

A: I did not.

Q: [A]s a result of your examination of the deceased, were you able to draw any conclusions as to the time of death of this particular individual?

A: No.

   * * *

Q: Did you actually make any observations or measurements with regard to the state of rigor mortis, the stiffening at the time you did your observation?

A: No.

   * * *

Q: Can you tell us from referring to your report or from your recollection what the time was when you performed your autopsy?

A: No. I'm sorry, it's not on the report.

Previously at Clark's trial—again on cross-examination—Dr. Parks was asked the following questions, and he responded as follows:

Q: Was there any way that you could determine the time of death?

A: Well, he showed advanced rigor mortis of his upper arms and legs, which reaches a peak somewhere around twelve hours after death, in a range of twelve to fifteen hours, and then it begins to slowly go away. So, you know, I could estimate that he might have died sixteen or eighteen hours prior to the autopsy.

Q: Okay, and the autopsy was the day after the body was found?

A: Right.

Q: And what time of day was the autopsy?

A: It was around noon, if I recall.

Q: And the body was found—

A: Found about 4 p.m.

Ashburn argues that this exchange demonstrates that Dr. Parks's testimony at his trial was false and that the state violated his due process rights by not correcting that knowingly false testimony. A prosecutor's knowing use of false

testimony violates a defendant's right to due process. *Napue v. Illinois*, 360 U.S. 264, 269–70 (1959). Under *Napue*, a petitioner must show that: "1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury." *United States v. Adcox*, 19 F.3d 290, 295 (7th Cir. 1994).

The state court concluded that the differences in Dr. Parks's testimony were mere inconsistencies. That conclusion was not unreasonable based on the facts of the case. First, we note that there is truly only one inconsistency—concerning the question of rigor mortis. At Clark's trial, Dr. Parks testified that Muckenstrum showed "advanced rigor mortis." But at Ashburn's trial, Dr. Parks stated that he had made no observations regarding rigor mortis. The question of rigor mortis by itself, though, is not the thrust of Ashburn's complaint. He complains that Dr. Parks estimated a time of death and lied to the jury about that fact, preventing him from establishing an alibi. But Dr. Parks's testimony at Clark's trial was consistent with his testimony at Ashburn's. At Clark's trial, Dr. Parks said he performed the autopsy "around noon, if I recall." That is entirely consistent with his later statement at Ashburn's trial that he did not recall the time of death and it was not noted on the autopsy report. It is also not accurate to say that Dr. Parks's testimony at Clark's trial showed that he had reached any conclusions or done any work concerning a time of death. Rather, at Clark's trial, Dr. Parks merely said that Muckenstrum "might have died sixteen or eighteen hours prior to the autopsy." This response came amidst a series of questions posed during the cross-examination of Dr. Parks at Clark's

trial. The questions asked of Dr. Parks at Clark's trial differed from those asked at Ashburn's trial, and that context easily explains any seeming inconsistencies in his testimony. Further, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990).

Moreover, even if Ashburn could show that the prosecution knowing used false testimony by Dr. Parks—that he had lied about not having determined the time of death—Ashburn cannot show any likelihood that the false testimony could have affected the jury's verdict. "[T]he alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *Adcox*, 19 F.3d at 295.

The estimate Dr. Parks gave at Clark's trial was clearly wrong since it would have placed Muckenstrum's time of death several hours *after* Muckenstrum's body was recovered. (The autopsy was performed at about noon the day after the body was found and eighteen hours earlier would have made the time of death about 6:00 p.m., but the body was found around 3:00 p.m.) Thus, that testimony would not help Ashburn establish an alibi and it did not "bear a direct relationship to the defendant's guilt or innocence." *Id*. In fact, Ashburn did not attempt to establish an alibi for any time frame between the last sighting of Muckenstrum and the recovery of his body. Further, as already discussed, the evidence against Ashburn was overwhelming (which explains why Ashburn didn't present an alibi, because his alibi was Clark, his accomplice.) Ashburn cannot succeed on a due process claim based on the purported use of perjured testimony.

### D. Jury Instruction

Finally, Ashburn argues that he is entitled to habeas relief because his due process rights were violated when the state trial court instructed the jury that he could be convicted of murder based on an accountability theory. The thrust of Ashburn's argument is that because the indictment did not charge him based on an accountability theory, it violated his due process rights to instruct the jury on accountability. But the United States Constitution does not require States to charge a defendant by indictment. *Bae v. Peters*, 950 F.2d 469, 477 (7th Cir. 1991) (citing *Hurtado v. California*, 110 U.S. 516 (1884)). Accordingly, in considering the validity of an indictment, general due process standards govern. *Bae,* 950 F.2d at 478.

The question thus is whether Ashburn had sufficient "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." *Id* at 478 (citation omitted). "So long as the defendant has received adequate notice of the charges against him so that he has a fair opportunity to defend himself, the constitutional requirement is met." *Id.*

Ashburn had more than adequate notice of the charges against him. The indictment charged him with shooting and stabbing Muckenstrum. Under well-established Illinois law, "a person charged as a principal can be convicted upon evidence showing that he was in fact only an aider or abetter." *People v. Doss*, 426 N.E.2d 324, 327 (Ill. App. Ct. 1981). That is "because accountability is not a separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense." *Id*. Accordingly, Ashburn was on notice that he could

be convicted of murder either as a principal or based on an accountability theory and his due process rights were not violated.

Alternatively, Ashburn argues that his due process rights were violated because the evidence did not support an accountability instruction. Putting aside again the question of forfeiture, this argument cannot succeed because the evidence was more than sufficient to support an accountability jury instruction. "Under Illinois law, an individual is legally accountable for the criminal conduct of another when he deliberately assists in planning or committing the crime." *Hennon v. Cooper*, 109 F.3d 330, 331 (7th Cir. 1997) (citing 720 ILCS 5/5-2(c)).

In this case, if Ashburn were not the actual shooter—as he confessed he was to Kelly—the evidence more than justified an accountability instruction. Specifically, the evidence established that Muckenstrum was last seen alive with Clark in a truck driven by Ashburn; that identification cards bearing Ashburn's name were found near to Muckenstrum's dead body; and that Ashburn possessed a gun of the same caliber as the murder weapon. This evidence supported the giving of an accountability instruction to the jury because, from that evidence, a jury could reasonably conclude that Ashburn deliberately assisted in the commission of the crime by providing transportation, supplying the weapon, or, because his identification was found near the body, by somehow otherwise helping in the actual murder. Accordingly, Ashburn's due process rights were not violated by the giving of this instruction.

## III.

The district court properly denied Ashburn's petition for habeas relief. First, his claim of ineffective assistance of appellate counsel cannot succeed because there was no underlying violation of Ashburn's constitutional right to a speedy trial. While there was a twenty-month delay between Ashburn's indictment for murder and his trial, the state caused only a portion of that delay and there was no prejudice to Ashburn—who was already incarcerated on another offense. Second, any error in admitting the knife evidence was harmless because the evidence presented at Ashburn's state trial for murder was overwhelming: he had recently threatened to kill the victim; the victim was last seen with Ashburn; Ashburn had shot a gun toward the victim shortly before the murder; several identification cards bearing Ashburn's name were found by the victim's dead body; and Ashburn confessed to the murder. For the same reason, even if Ashburn had shown that Dr. Parks testified falsely at his trial—which he has not—there is no chance that that purportedly false testimony could have altered the outcome of his trial. Finally, Ashburn was not denied his due process rights when the judge gave the jury an accountability instruction. Because Illinois law clearly established that Ashburn could be found liable either as a principal, or on an accountability theory, Ashburn was on notice of that possibility. The evidence also more than supported the accountability instruction given that Ashburn was seen with Clark and Muckenstrum before the murder, possessed a gun of the same caliber as used in the murder, and his identification cards were found by the dead body. For these and the foregoing reasons, we AFFIRM.