In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3365

ISAIAH BRADY,

*Petitioner-Appellant*,

*v.*

RANDY PFISTER, Acting Warden,
Pontiac Correctional Center,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 2098—**Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 17, 2012—DECIDED APRIL 1, 2013

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Isaiah Brady was convicted in Illinois state court of first-degree murder for the shooting death of Andrea McDaniel, his girlfriend and the mother of his eighteen-month-old daughter. Brady no longer disputes that he shot McDaniel, though he claims it was an accident and has proffered four wit-

nesses to corroborate his story. None of them testified at trial, because Brady's lawyer did not call them. This amounted to constitutionally ineffective assistance of counsel, in Brady's view. The state courts were not persuaded that this omission was serious enough to undermine his conviction, and the district court held that their decision was not so unreasonable that federal relief was possible. Even assuming that the performance of Brady's lawyer fell below constitutional standards, we conclude that Brady's inability to show prejudice dooms his petition under 28 U.S.C. § 2254. We therefore affirm.

## I

### A

McDaniel arrived at the emergency room of Provident Hospital in Chicago in the early hours of May 10, 2001, with a gunshot wound to the head. She died two days later. Her death was ruled a homicide, and Brady quickly became a suspect. After several weeks on the run, Brady was arrested in Los Angeles, California, on June 6, 2001, extradited to Illinois, and charged with murder.

Brady was convicted in a bench trial in November 2002. The prosecution's theory was that Brady, who had a history of abusing McDaniel, shot her in the course of an argument that broke out when she attempted to leave him. To prove its case, the state presented witnesses to testify about: (1) Brady's history of domestic

violence toward McDaniel; (2) Brady's actions before and after the shooting; (3) physical evidence found in Brady and McDaniel's apartment; and (4) Brady's flight to California.

To establish the first point, the state presented several police officers who had responded to domestic disturbance calls at Brady and McDaniel's apartment in the past. On some occasions, the officers had discovered serious problems. For example, about 11 months before the shooting, officers had to force their way into the apartment as they heard McDaniel screaming for help. Once inside, they observed McDaniel with bruises on her arm and face; she told them that these were the results of Brady's having hit her with a broomstick. After he was placed under arrest and informed of his rights, Brady told the officers that he beat McDaniel because she stayed out at night and did not take care of their children.

Corey Hall, a close friend of McDaniel who lived across the courtyard from Brady and McDaniel's apartment, also provided information about Brady's actions before the shooting. On the night of May 9, 2001, Hall and some friends, including Brady and McDaniel, were sitting on Hall's back porch. Hall testified that Brady had with him a .38-caliber revolver, which Hall saw when it fell out of Brady's pants. Later that evening, Hall joined Brady and McDaniel for tacos in their apartment; he left shortly after midnight. Approximately one hour and 10 minutes later, Hall was on his way to a nearby store when he saw Brady walking in the direc-

tion of Brady's own apartment. Hall recalled that Brady seemed nervous.

Three witnesses—Antoinette Dill, Gail Gray, and Wanda Riley—testified about Brady's actions in the wake of the shooting. Dill, who lived on the floor below Brady and McDaniel, watched as Brady removed McDaniel from the apartment. At about 1:30 a.m., Dill heard Brady and another man (who turned out to be Brady's stepfather) speaking near her window. According to Dill, the other man said "she's dead," to which Brady responded, "she's not dead yet, help me carry her." Dill then heard a woman screaming for someone to call an ambulance and saying "don't move her." As Dill left her apartment to offer help, she saw Brady and another man placing McDaniel in the back seat of a black car. A woman (Brady's mother) was sitting in the car and asked Dill to call 911, but Brady responded that there was no time and that they needed to drive McDaniel to the hospital.

Gray, an emergency room nurse at Provident Hospital, was on duty when Brady drove up with McDaniel around 1:35 a.m. Brady identified himself as McDaniel's boyfriend. After taking McDaniel to the resuscitation room, Gray spoke briefly with Brady about McDaniel's medical history. About 10 to 15 minutes after Gray returned to the resuscitation room, a police officer came looking for Brady, but Gray was unable to find him.

Riley, Brady's grandmother, lived around the corner from Provident Hospital. Some time after 1:30 a.m., Brady

showed up at her apartment and asked to borrow her car. He told Riley that McDaniel had been shot and that he needed to pick up his daughter, who was apparently still back at the apartment. Riley needed her car for work the following day, and so she refused Brady's request. Brady grabbed her car keys anyway and tried to leave, taking along some clothes that belonged to Riley's son. Riley followed him and recovered the keys. Brady then ran off in the direction of his apartment, leaving the clothes behind. Five minutes later, Brady's mother and stepfather arrived at Riley's home with Brady's daughter.

Several witnesses described the physical evidence. Most importantly for our purposes, Officer Joseph Dunigan testified about the chaotic condition of McDaniel and Brady's apartment immediately following the shooting. There was blood on the rear stairs as well as in the kitchen; bloody towels and clothing lay on the kitchen floor. The master bedroom was a mess: the door was marked and damaged near the handle; clothes and a bloody mattress were strewn about; a television was on the floor; and there was blood on the wall. Dunigan recovered two .38-caliber cartridges from the bedroom.

The final support for the state's case came from Brady's flight to California. Makeeta Burke testified that she met Brady in a Los Angeles bar. Brady told Burke that his name was Rico Holt, that he was from New York, and that he was in California to care for his grandfather. He volunteered that he was on the run from the

FBI because some of his friends were drug dealers. Shortly before his arrest, Brady told Burke that he had accidentally killed his daughter's mother when his gun unexpectedly fired as he took it off a shelf. Brady said that he fled to California because the police had come to his home on other occasions when he and McDaniel were arguing. He asserted that he was planning to turn himself in as soon as his family was able to hire a lawyer.

After he was arrested, Brady continued for a time to maintain that his name was Rico Holt. The Chicago police officer who handled Brady's extradition from California testified that Brady identified himself as Holt when they first spoke in the Los Angeles County Jail.

Brady's trial counsel presented only one defense witness: Brady's grandfather, Claude Sanders. Sanders testified that he advised Brady to leave town after the shooting because he had heard that Brady's life was in danger.

The court found Brady guilty of first-degree murder. It credited the testimony of Burke and Hall and concluded that their account supported the inference that Brady (as opposed to someone else, such as an intruder) had shot McDaniel. The court rejected the idea that the shooting was an accident. Believing that Brady's story to Burke was fabricated to maintain his relationship with her, the court found it not to be credible. The court also found that Brady's behavior after the shooting was not consistent with an accident. It noted that Brady did not call paramedics or seek help from

his neighbors; instead, he delayed McDaniel's treatment for a "significant time" when he decided to call his mother first. Brady then attempted to obtain fresh clothes and a car, suggesting an intent to flee. He never returned to the hospital to check on McDaniel, nor did he turn himself in or seek legal advice. Suspiciously, he fled to California and assumed an alias. In the court's view, these were not the actions one would expect of a person who accidentally had shot a loved one. The court sentenced Brady to consecutive sentences of 25 years each for murder and for personally discharging the firearm that killed McDaniel, for a total of 50 years.

## B

In 2006, Brady filed a *pro se* post-conviction petition in state court arguing, among other things, that his trial counsel was ineffective for failing to present several witnesses. Attached to the petition were affidavits from four people—Marshawn Brady, Sondra Burke, Elliott Moore, and Flora Small—stating what testimony they would have provided had they been called.

Marshawn Brady is Brady's stepfather. In his affidavit, he swore that he and Brady's mother went to the apartment after the shooting to get Brady's daughter. While Brady's mother tended to the daughter, Marshawn forced his way into Brady and McDaniel's bedroom and ransacked the room looking for valuables. Marshawn said that the bedroom was neat when he entered and

that he alone was responsible for the disarray Officer Dunigan encountered later that morning.

Sondra Burke, a friend, stated in her affidavit that she saw McDaniel alive at 12:20 a.m., when she picked up Brady from the couple's apartment. She drove Brady to her house, stopping at a payphone along the way so that Brady could call his mother. Brady and Burke spent about 35 minutes at Burke's apartment, and then Burke drove Brady home because his mother was coming to pick him up. Burke dropped Brady off at his apartment at 1:10 a.m. Burke's testimony thus would have established that McDaniel could not have been shot before 1:10 a.m., and also that Brady's mother was on her way to the apartment when the shooting occurred.

Elliott Moore, also a friend, was prepared to testify that he saw Brady running down Wabash Street around 2:00 a.m. Brady told Moore that McDaniel had been shot and that he needed to pick up his daughter, who was back at the apartment. Moore drove Brady to the apartment, and Brady went inside. He came back out several minutes later, crying and screaming that his apartment had been ransacked and his daughter kidnapped. Brady used Moore's cell phone to call Provident Hospital. He told Moore that McDaniel had been transferred to Cook County Hospital. Moore's testimony would have corroborated Marshawn's story, and would have shown that Brady checked on McDaniel after leaving the hospital.

Finally, Brady's aunt, Flora Small, stated in her affidavit that Brady called her around 2:30 a.m. on the

day of the shooting. Brady asked Small if she had taken his daughter from the apartment. He was crying and told her that McDaniel had been shot and that his apartment had been ransacked. Small told Brady to come over. When Brady arrived, he made a phone call and then told Small that his daughter was with his grandmother. Brady told Small that he accidentally had shot McDaniel while she was folding clothes. He carried her into the kitchen, and when his mother arrived shortly thereafter, he carried her down to his mother's car and asked his mother to drive them to the hospital. After realizing that his daughter was still in the apartment, he tried to borrow Riley's car. When she refused to let him use it, he made his way toward his apartment on foot until a friend picked him up and drove him the rest of the way. Small's testimony would have shown that Brady described the shooting as an accident at least once before meeting Makeeta Burke.

The state trial court dismissed Brady's petition as "frivolous and patently without merit." The Illinois appellate court affirmed, holding that Brady's petition failed to present a colorable claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). The appellate court first found that counsel's performance was reasonable, both because Brady had not alleged that any of his proposed witnesses had ever shared the information in their affidavits with trial counsel, and because "none of the witnesses appear to have any direct knowledge of the shooting." The court further concluded that even if Brady could show that counsel's performance was deficient, he could not show

that this deficient performance prejudiced his case, because the witnesses' "close relationship" to Brady made it "unlikely" that their testimony would have altered the outcome of the trial. The Illinois Supreme Court denied Brady's petition for leave to appeal.

Brady next filed a timely petition for *habeas corpus* in the Northern District of Illinois. Again, he contended that his lawyer had rendered ineffective assistance by failing to call his proposed witnesses. After reviewing this claim in considerable depth, the district court concluded that although the state appellate court applied federal law unreasonably in finding that trial counsel's performance was constitutionally adequate, see 28 U.S.C. § 2254(d)(1), its conclusion that Brady could not show prejudice was entitled to deference. The district court thus denied Brady's petition, but it issued a certificate of appealability on his ineffective assistance claim.

**III**

The standard for evaluating a claim of ineffective assistance of counsel is a familiar one: the court must assess both whether counsel's performance was deficient and whether the defendant suffered prejudice as a result. In *Strickland*, the Supreme Court explained that deficient performance "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. In evaluating performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of rea-

sonable professional assistance." *Id.* at 689. As for preju-
dice, *Strickland* instructs that a defendant must do
more than show that his attorney's conduct had "some
conceivable effect on the outcome," though the "defendant
need *not* show that counsel's deficient conduct more
likely than not altered the outcome in the case." *Id.* at
693 (emphasis added). Instead, the "defendant must
show that there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable
probability is a probability sufficient to undermine con-
fidence in the outcome." *Id.* at 694. The petitioner
must show both deficient performance and prejudice
in order to prevail.

Because Brady seeks relief from a state convic-
tion, we review his *Strickland* claim through the lens of
28 U.S.C. § 2254(d)(1), which permits a federal court
to issue a writ of *habeas corpus* only if the state court
reached a decision that was "contrary to, or involved
an unreasonable application of, clearly established
Federal law as determined by the Supreme Court." This
standard is not met if the state-court decision is merely
incorrect; as the Supreme Court put it recently, an unrea-
sonable decision is one "so lacking in justification that
there was an error well understood and comprehended
in existing law beyond any possibility for fairminded
disagreement." *Harrington v. Richter*, 131 S. Ct. 770,
786-87 (2011). With this in mind, we turn to the specifics
of Brady's claim.

A

As we noted earlier, the district court was satisfied that the Illinois appellate court had addressed both the performance aspect of the *Strickland* inquiry and the prejudice question. Although the state court's opinion is somewhat vague in this respect—it speaks of presenting the "gist" of a constitutional claim—we agree with our colleague that a generous reading of the state-court opinion supports this result. In the district court's view, the state court's conclusion that the performance of Brady's lawyers was constitutionally effective was unreasonable, even under the deferential standard required by Section 2254(d)(1). But because the district court found that the state court's ruling that Brady was not prejudiced by this deficient performance lay within the bounds of reason, it denied relief.

The Illinois appellate court offered a single justification for its conclusion that Brady could not demonstrate prejudice: "Finally, we note that each of the affiants was either a friend or relative of defendant. Accordingly, based on their close relationship to defendant, it is unlikely that even if the witnesses had been called, that their testimony would have altered the trial result." This reasoning is deeply problematic. Witnesses with ties of family or friendship to a defendant are a common feature in criminal cases, and those witnesses are often privy to details that influence the outcome of a case. The state court pointed to nothing in the record that would support the assumption that the trial court would not have credited the witnesses' testimony solely

because of their association with Brady. Indeed, the
law does not demand, or even permit, the disregarding
of their testimony just because they are close to the ac-
cused. *Cf. Raygoza v. Hulick*, 474 F.3d 958, 965 (7th Cir.
2007) (counsel was deficient for failing to call family
and family friends of defendant as alibi witnesses). While
the trier of fact would have been entitled to take the
relationships into account in assessing the witnesses'
credibility, the appellate court was wrong, to the point
of being unreasonable, to conclude that this fact meant
that the absence of their testimony could not possibly
have made any difference.

Perhaps recognizing this, the state makes little effort
to defend the appellate court's rationale for its prejudice
ruling. Instead, it encourages us to apply Section
2254(d)(1)'s deferential standard to the bottom-line con-
clusion, asserting that the Supreme Court's recent
decision in *Richter* supports this approach. It argues
that we should actively disregard the explanation the
appellate court gave and instead either invent a chain
of reasoning under which the state court's conclusion
can be reconciled with established federal law as deter-
mined by the Supreme Court or at least look back to the
record before the trial court and see if the result can be
supported that way. Although the district court did
not spell out this line of thought, it may have agreed. In
the final analysis, the district court set aside the state
appellate court's stated reason for finding lack of
prejudice and weighed the evidence for itself, just as a
court would do if it were reviewing a *Strickland* claim
in the first instance. See 466 U.S. at 695-96. Using that

methodology, the district court concluded that because the proffered testimony would not have rebutted those aspects of the case that figured most prominently in the trial court's finding of guilt, the appellate court's finding of no prejudice was not unreasonable.

Lying behind the state's argument are two questions that bear on the administration of Section 2254(d)(1): first, whether *Richter* (a) applies only to cases in which the state court offers no reasoning, or instead (b) holds in effect that federal courts should always entirely disregard the state court's rationale and decide independently if the bottom line is justifiable; and second, if *Richter* applies only to summary dispositions, how a federal court should evaluate a case in which the state court offers a reason, but that reason is either wrong as a matter of law or patently irrational. Since the oral argument in this case, the Supreme Court has addressed these points, in *Johnson v. Williams*, 133 S. Ct. 1088 (2013).

The focus of the Court's opinion in *Williams* was the meaning of the "adjudication-on-the-merits requirement" in 28 U.S.C. § 2254(d). In that sense, *Williams* followed up on the Court's earlier decision in *Richter*, where it had considered how to approach cases in which "state-court relief is denied without an accompanying statement of reasons." 131 S. Ct. at 780. *Richter* held that the deferential standard set out in Section 2254(d) applies even in such a case. *Id*. at 784. The Court there was not concerned that such a holding would induce state courts to withhold explanations for their decisions. *Id.* Nor did it credit the argu-

ment that it is impossible to know if a summary disposition was on the merits or not. Instead, it endorsed a presumption that such a resolution was on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785. Having established that Section 2254(d) applies to summary dispositions, the *Richter* Court concluded by reviewing the merits of the case and ruling that the state court's conclusion—that Richter had received constitutionally adequate assistance of counsel—should not be disturbed. *Id.* at 792.

*Williams* took the next step: it addressed the issue that arises "when a defendant convicted in state court attempts to raise a federal claim, either on direct appeal or in a collateral state proceeding, and a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question." 133 S. Ct. at 1091. *Richter*, it held, pointed the way to the proper resolution of that issue. Under these circumstances, "the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." *Id.* The Court suggested several ways in which a petitioner might rebut the presumption: if the state court relies exclusively on state law, and the state standard is less protective than the federal one, rebuttal could occur; or the governing federal standard might simply have been "mentioned in passing in a footnote or [been] buried in a string cite." *Id.* at 1096. In instances like those, either the petitioner might rebut the presumption and show that the federal court should review

the claim *de novo*, or the state might rebut the presumption and show that the federal claim was procedurally defaulted. *Id.* Furthermore, the Court held, "[i]f a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter." *Id.* at 1097. Such a claim has not been evaluated on the merits, and thus does not satisfy the requirements of Section 2254(d). *Id.* Concurring in the judgment, Justice Scalia also rejected "the proposition that a judgment denying a federal claim is irrebuttably presumed to have been 'adjudicated on the merits' within the meaning of 28 U.S.C. § 2254(d)," but he did not share the majority's view that one permissible way to rebut the presumption is to show that the federal claim was inadvertently overlooked. *Id.* at 1099.

*Williams* therefore confirms the fact that the state court's reasoning continues to be relevant wherever it has given an explanation, notwithstanding the holding in *Richter*. The presumption the *Williams* Court adopted, however, means that state courts must be given the benefit of the doubt when their opinions do not cover every topic raised by the *habeas corpus* petitioner. Federal courts will still need to evaluate whether the state court's conclusion was "contrary to" authority from the Supreme Court in light of the state court's explanation for its holding. The same is true of the "unreasonable application" branch of the statute; the Supreme Court speaks of looking at the state-court opinion to see if it "identifies" the correct principle but unreasonably applies it to the case at hand. *Williams v. Taylor*, 529 U.S.

at 413. This is precisely what the Court did in cases such as *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003), when it had a reasoned decision before it. Nothing in *Johnson v. Williams* indicates that these decisions have been undermined.

Brady's case presents a variant on the pattern described by *Johnson v. Williams*. Reading the state-court opinion generously, we have already decided to treat it as addressing both parts of the *Strickland* inquiry—performance and prejudice. The problem is thus not silence; it is what to do if the last state court to render a decision offers a bad reason for its decision. And more particularly, the question is what should happen when a person argues ineffective assistance of counsel, which requires application of a two-part test: inadequate performance and prejudice. Is this a single "claim" for purposes of Section 2254(d), or should the performance and prejudice elements be assessed separately? In earlier cases, the Supreme Court has assessed each element independently for Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) purposes. In *Wiggins*, for example, the Court applied AEDPA deference to the performance branch of *Strickland*, and it reviewed the prejudice question *de novo.* 539 U.S. at 534. But it did so without any discussion of the one-claim/two-claim question. If this aspect of *Wiggins* is still good law, then the standard of review can change for individual elements of a claim. This is so despite the fact that, for purposes of ultimate relief, we have understood Sixth Amendment challenges to the effectiveness of counsel as a single "claim." See, *e.g.*, *Pole v. Randolph*, 570 F.3d 922,

934-35 (7th Cir. 2009); *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005). On the other hand, if it is the claim as a whole that qualifies (or not) for treatment under Section 2254(d)(1), then the standard of review would remain consistent for both elements. The Supreme Court recently denied *certiorari* in two cases raising this very question, see *Wolfenbarger v. Foster*, No. 12-420 (Mar. 18, 2013), and *Bland v. Lemke*, No. 12-594 (Mar. 18, 2013), and so, for the time being, the courts of appeal will continue to confront this question without guidance from the Court. As we now explain, however, the choice between these standards makes no difference to the outcome here.

In Brady's case, the Illinois appellate court was the only state tribunal to address Brady's *Strickland* claim, and it found neither deficient performance nor prejudice. The district court explained why it thought the former finding was unreasonable, and we have indicated why the *reason* expressed for the finding on prejudice was wrong. (Brady additionally argues that the Illinois appellate court's decision should be rejected under the "contrary to" part of Section 2254(d)(1), but like the district court, we see no merit in this point. The state court may have paraphrased *Strickland* a bit, but there is no substantive difference between the standard it used and the one required by the Supreme Court.) Under *Johnson v. Williams* and *Richter*, it is clear that a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine. A state court could write that it rejected a defendant's claim because Tarot cards dictated

that result, but its decision might nonetheless be a sound one. If a state court's rationale does not pass muster under the *Williams v. Taylor* standard for Section 2254(d)(1) cases, the only consequence is that further inquiry is necessary.

At that point, it is no longer appropriate to attach any special weight to the last state court's expressed reasons. The court's judgment, however, is another matter. With the last state court's reasoning set aside, the federal court should turn to the remainder of the state record, including explanations offered by lower courts. The only question in that situation is whether AEDPA deference applies to those lower state-court decisions, or if review is *de novo*. In close cases, it is conceivable that the choice of standard might make a difference: if the lower courts' reasoning was incorrect, then the result might be set aside on *de novo* review but not (as *Richter* explained) under AEPDA. But it is unlikely that the standard would affect very many cases. It is worth recalling that the pre-AEDPA standard was also quite deferential to the state courts. See *Richter*, 131 S. Ct. at 788 ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."); *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir. 2011) ("[W]e review the petitioner's constitutional claim with deference to the state court, but ultimately *de novo*.") (internal quotation marks omitted). If the record as a whole supports the state court's outcome, then even under *de novo* review the correct result would be to deny the petition for a writ of *habeas corpus*.

B

The kind of independent review we have described is the best that Brady can hope for, and so we now consider whether he can prevail under that approach. Prejudice, for purposes of *Strickland*, exists if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The state trial court offered several reasons for its conclusion that the shooting was not accidental: (1) its evaluation of Brady's statement to Makeeta Burke that the shooting was an accident as a fabrication intended to maintain his relationship with her; (2) its adverse inference from Brady's behavior after the shooting, including (a) the fact that Brady called his mother, rather than 911 or his neighbors, for assistance following the shooting, (b) the fact that Brady sought to borrow a car and fresh clothes from his grandmother rather than returning with his parents to his apartment to retrieve his daughter, (c) Brady's failure to return to the hospital or otherwise check on McDaniel, and (d) Brady's flight to California and assumption of an alias.

Even setting aside the (likely) possibility that much of the witnesses' proposed testimony is inadmissible hearsay, we conclude that this testimony does not undermine the guilty verdict. Elliott Moore's and Flora Small's testimony would have shown that Brady was crying and emotionally distressed the night of the shooting, but this is not especially probative. Brady might just as well have been crying in remorse for

having murdered McDaniel or in fear of being caught as for having shot her accidentally. Marshawn Brady's testimony that he was responsible for the chaotic state of Brady and McDaniel's bedroom would have undermined the prosecution's theory that McDaniel and Brady fought before the shooting. On the other hand, Marshawn's story fails to account for the blood all over the room; it is highly implausible; and it is largely irrelevant given that the trial court offered no indication that it relied on the disarray in the bedroom in any way. Sondra Burke's testimony would have established that McDaniel was taken to the hospital very shortly after being shot, and thus that she did not go untreated for very long. It also suggested that Brady relied on his mother to take him and McDaniel to the hospital because she was on her way to their apartment prior to the shooting. Once again, this is of peripheral importance at best; the trial court mentioned delay only briefly, and Burke's testimony says nothing about most of the damning information.

None of the proffered witnesses offers a plausible alternative explanation for Brady's decision to flee. Although Small's testimony (if admissible) would have established that Brady claimed to have shot McDaniel accidentally on at least one occasion before he met Makeeta Burke—a fact that would tend to undermine the inference that his statement to Burke was false—other features of Brady's flight to and time spent hiding in California remain unexplained. Importantly, none of the witnesses suggests why Brady fled rather than cooperate with the police, nor do they explain his

use of an alias. As Brady's flight was one of the most important considerations behind the trial court's verdict, this gap in the witnesses' testimony is significant.

Given that so much of the proposed testimony was only marginally exculpatory, we do not find a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. Having failed to establish prejudice even under the more generous standard of review, Brady cannot show ineffective assistance of counsel and is thus not entitled to a writ of *habeas corpus*. We would reach the same result if we were reviewing the entire state court record using the standards set out in Section 2254(d). Either way, we AFFIRM the judgment of the district court.