NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230654-U

NO. 4-23-0654

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 21, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| STEPHEN BAILEY, | ) | No. 05CF937 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

_____

JUSTICE VANCIL delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's denial of defendant's postconviction petition, concluding that the court did not manifestly err when it found that defendant had not been denied the effective assistance of counsel by his trial attorney's refusal to call his father to testify as an alibi witness at his trial for murder.

¶ 2    In 2007, a jury found defendant, Stephen Bailey, guilty of first degree murder (720 ILCS 5/9-1 (West 2004)), and the trial court sentenced him to 40 years in the Illinois Department of Corrections. Later, defendant petitioned for postconviction relief, claiming that his trial counsel was ineffective because he failed to call defendant's father to testify at trial as an alibi witness. After an evidentiary hearing, the court denied defendant's petition, finding that the father's testimony was not credible.

¶ 3         Defendant appeals, arguing that the trial court manifestly erred when it denied his claim of ineffective assistance of counsel. We find that the court's decision was not manifest error, so we affirm.

¶ 4                                  I. BACKGROUND

¶ 5         In 2005, the State indicted Louis Bailey, Torlando McDonald, and defendant for the murder of Darren English in August of that year. At the joint trial held for defendant and Bailey, a series of Peoria first responders testified and described the condition of the crime scene on the night of the murder. The body of a man, later identified as Darren, was on the ground in the backyard of a small, two-unit apartment building. The victim was dead from a gunshot wound to his head. The back door to one of the apartments, the residence of Lavinia Faulkner, was open. Inside, blood was on the walls, floor, and appliances, objects were knocked over, and cartridge cases and unfired bullets were scattered around. In the bathroom, the shower curtain was knocked down, and the top of the toilet was in the bathtub. In the living room, one officer found a mirror, razor, and sandwich bags. The bedroom appeared undisturbed.

¶ 6         Officer Scott Bowers testified that he collected evidence from the site. He recovered a plastic bag containing a white substance from the driveway. He found one unfired 9-millimeter cartridge case in the driveway and one fired cartridge case on the sidewalk near the body in the backyard. In the kitchen, he recovered two unfired cartridge cases, a fired cartridge case from the floor, and a fired cartridge case from the sink. In the living room, he found two unfired cartridge cases on the floor and a fired cartridge case near the bathroom. Later, he recovered two bullets, one from the kitchen and another from the neighboring apartment adjoining the bathroom. Finally, he received a third bullet that had been removed from English's right arm during an autopsy. The

jury saw pictures of the layout of the apartment and the body. Photographs of the bullets, cartridge cases, rooms, blood, and drug dealing materials were admitted into evidence.

¶ 7 Dr. Violette Hnilica testified that she performed an autopsy on the victim. His body had three gunshot wounds, some blunt force injuries, some abrasions on the side of his face, wrist contusions, and an abrasion on his left arm. The most extensive bruising was on the back of his head. His head had entry and exit bullet wounds. Another bullet wound was on his right elbow, and the bullet was recovered from under his shoulder. A third bullet wound was in his abdomen. Regarding the wound to his abdomen, Dr. Hnilica indicated that he did not have much blood in his abdominal cavity, indicating that this wound occurred near the end of English's life. She confirmed that his cause of death was multiple gunshot wounds.

¶ 8 Marion English, wife of the victim, testified that in August 2005, defendant was living with her and her husband. On the day of the murder, Marion had driven to Chicago with her husband, defendant, and two others. When they returned to Peoria around midnight, she dropped Darren and defendant off at their home and left to take another passenger home. When she returned to her home, Darren was not there. Seven or eight hours later, she spoke to the police. She then saw her husband's body in the morgue. Marion testified that before the night of the murder, her house had recently been burglarized and defendant's money had been stolen.

¶ 9 A neighbor of Faulkner testified that on the night of the murder, she awoke between 2:45 a.m. and 3 a.m. to the sound of a gunshot. She looked out her balcony window and saw a man dead on the ground and a woman screaming.

¶ 10 The State's key witness was McDonald. At the time of the trial, he was serving a sentence in an Illinois correctional facility after being convicted of aggravated battery. He testified that one night in August 2005, he and Bailey went to the apartment of an associate, Lavinia

Faulkner, between 1 a.m. and 3 a.m. On the way, McDonald saw that Bailey had a 9millimeter handgun. When they arrived, defendant answered the door. Darren was cutting and packaging heroin on the floor in the living room. Bailey sat down and took out his gun. Defendant grabbed the gun, then went to another room and returned with Faulkner. Defendant began asking Darren about money that had recently been stolen from defendant. Defendant asked Darren where his money was, and Darren replied that he did not know what defendant was talking about. Defendant told Bailey to pick up the baggies, and Bailey picked up the baggies that Darren had already packaged and pocketed them.

¶ 11        McDonald testified that defendant pointed the gun at Darren and continued asking what happened to his money. Darren insisted that he did not know anything about the money. Defendant handed Bailey the gun and told him to "[g]et it over with." Bailey pointed the gun at Darren, and McDonald heard the gun click. While Bailey tried to discharge the gun, Darren jumped out of his seat, and Bailey hit him with the gun. They wrestled into the bathroom. Bailey let off two shots and then stepped back to discharge a bullet because the gun had jammed. Darren and Bailey wrestled over the gun, eventually moving out of the bathroom, through the living room, and into the kitchen.

¶ 12        McDonald testified that a curtain blocked his line of sight into the kitchen. He heard two more shots. At this point, McDonald left through the front door. During the fight, defendant was holding Faulkner, and Faulkner was screaming. Soon after McDonald left, he heard two more shots that sounded like they came from outside. McDonald went to a nearby house and asked a woman there for help, and she called the police.

¶ 13        McDonald told the jury that later that same day, he called defendant on the phone. He asked why defendant did what he did to Darren, and defendant said that his " 'money came up

missing. He knew what happened and he had to go.' " McDonald testified that defendant indicated that he had given Faulkner money to leave town. McDonald admitted to the jury that he was testifying pursuant to an agreement with the State that he would plead guilty to obstruction of justice for a three-year sentence and the murder charge against him would be dismissed in exchange for his truthful testimony.

¶ 14    On cross-examination, McDonald admitted to the jury that he could not see what happened in the kitchen. He said that he heard only one gunshot in the kitchen, but he could not recall if he heard any shots in the living room. He testified that throughout the entire encounter, he was sitting on a loveseat in the living room, until he fled out the front door. He also admitted that when he first talked to the police, he had denied knowing Bailey or defendant, knowing anything about what happened on the night of the murder, and being present at Faulkner's apartment that night. He further testified that when he was interviewed by the police about the murder, they provided him pictures of defendant, Bailey, and Darren.

¶ 15    The jury found defendant guilty of first degree murder. The trial court sentenced defendant to 40 years' incarceration. The Third District upheld that judgment on direct appeal. *People v. Bailey*, No. 3-08-0235 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 16    In 2010, defendant filed a petition for postconviction relief, alleging that he was prejudiced by the State's closing argument and its failure to test certain evidence. He also alleged ineffective assistance of counsel—the claim that ultimately provides the basis of this appeal. Defendant produced an affidavit from his father, Stephen Bailey Sr., stating that defendant was playing video games with him at the time of the murder, so he could not have committed the offense. Defendant claimed that his trial attorney was ineffective because he failed to interview his father or call him as a witness. The trial court denied the claims of prejudice based on the

State's closing argument and failure to test evidence but advanced the ineffective assistance claim to the second stage. Later, defendant added a new claim of actual innocence. In 2014, the court dismissed the ineffective assistance claim but advanced the actual innocence claim to a third-stage evidentiary hearing. After an evidentiary hearing, the court denied defendant's actual innocence claim.

¶ 17        On appeal, the Third District reversed the dismissal of the ineffective assistance claim. *People v. Bailey*, 2018 IL App (3d) 150430-U, ¶ 30. The court reviewed the trial court's dismissal at the second stage of postconviction review, so it accepted defendant's father's affidavit as true. Based on Bailey Sr.'s claims that defendant was with him at the time of the murder and that defendant's trial attorney never spoke to him, the court found that defendant made a substantial showing that his attorney's representation was deficient. *Id.* ¶ 26. The court further found that "presenting defendant's father as an alibi witness would not have been harmful to defendant's case. *** Without hearing from counsel, it is impossible to determine what reasons lead to his decision not to investigate the father's potential testimony or not to use him as an alibi witness at trial." *Id.* ¶ 28. The Third District remanded for a third-stage evidentiary hearing. *Id.* ¶ 29.

¶ 18        In January 2023, the trial court conducted a third-stage evidentiary hearing on defendant's claim that his trial counsel had been ineffective for failing to call his father to testify as an alibi witness. Defendant's father testified that he was present in the hallway at the courthouse on the date of the trial because the State had sent him a subpoena, but neither side called him as a witness. Bailey Sr. denied ever speaking with defendant's trial attorney. He testified that on the date of the murder, defendant was at his house from around midnight until 7 a.m. They were playing video games from midnight until about 4 a.m. At around 4:15 a.m., defendant laid down on the couch while his father went to bed. Bailey Sr. testified that he awoke around 6 a.m.,

defendant was asleep on the couch, and defendant was still asleep when Bailey Sr. left for work around 7 a.m. Then defendant's attorney asked, "And when you left the house at 6:00, you went where?" Bailey Sr. answered, "To work." Defendant's attorney asked, "So you can say continuously from midnight to 6:00 a.m. he was in your presence in your house?" and Bailey Sr. answered, "Yes."

¶ 19 The State cross-examined defendant's father about a meeting between him and the police in September 2005, a few weeks after the murder. Police officers had arrived at Bailey Sr.'s place of employment and escorted him to his house. Bailey Sr. told the police that he had not spoken to defendant for four to five days. He told them that he knew his son was wanted for murder because he had seen defendant's photograph in the newspaper. He also told them that defendant had moved out of the house about a month prior and moved in with Darren. He said that he did not tell the officers that he was with defendant playing video games on the day of the murder because "[t]hey didn't ask." The State's attorney asked, "But it didn't occur to you within two weeks and you knew your son was out on the run somewhere or hiding somewhere and that was wanted for murder to tell the police he was there with you that night?" Bailey Sr. responded, "Yeah. Would they believe me? No."

¶ 20 Defendant also testified at the third-stage hearing. He said that Thomas Iben was his attorney throughout the entire trial proceedings. Before the trial, Iben had asked him for a list of witnesses, and defendant gave him the name of his father and no one else. Iben never filed any notice of an alibi defense. Defendant testified that during the trial, after the State rested, he and Iben discussed whether Iben would call his father as a witness. Iben told defendant that he did not want to call Bailey Sr. because juries would not believe a family member and Iben thought that the State's case was weak.

¶ 21        Finally, Iben testified. He confirmed that he had not filed an alibi defense. He acknowledged that defendant had raised the possibility of his father providing an alibi, but Iben had no evidence to corroborate the father's proposed testimony. Iben indicated that his trial strategy was to focus on the weak evidence against defendant. In his closing statement to the jury, he asked them to be "scrupulous in their examination of evidence generally." With this framing, he did not want to present his own "speculative" evidence. When asked about the police report documenting Bailey Sr.'s interaction with the police after the murder, Iben testified that he knew that he had the report at the time of trial, although he did not remember seeing it. He did not remember any specific details about his own communication with Bailey Sr., although he thought he remembered talking to him at the courthouse. He thought he interviewed the father about the potential alibi, but he was not sure. He testified that he told defendant that he was not calling the father as a witness because family alibis are "notoriously questionable," and the State had experienced prosecutors on the case. He said that testimony about family alibis is "often very questionable evidence and juries are suspicious of it and prosecutors can have a field day with it and make the defense look like idiots."

¶ 22        After the testimony was presented, defendant's attorney argued that Iben had not talked to Bailey Sr. prior to trial. Bailey Sr. testified that Iben never interviewed him, and Iben thought he did but was not sure. He also argued that Iben was ineffective because he presented no evidence at trial. The trial court asked postconviction counsel about the fact that Bailey Sr. said nothing to the police about the supposed alibi. Postconviction counsel responded that the officers never asked Bailey Sr. about this. The court commented:

        "If I had knowledge that would clear my son of a murder charge, they would have had to gag me to stop me from volunteering that information. I wouldn't say,

oh, I hope they're going to ask me about that. I'm just dying to tell them this. Rats, they never asked me. I don't know. Good luck, son."

Postconviction counsel responded that the officers had asked only general questions about Bailey Sr.'s contact with defendant.

¶ 23 The trial court denied defendant's petition. Its order summarized Bailey Sr.'s testimony as follows: "(1) Defendant was with him from midnight to at least 7:00 a.m.; (2) Defendant was with him from midnight to 6:00 a.m.; and (3) From 4:15 a.m. to 6:00 a.m., Defendant's Father was asleep. The lack of certainty by Defendant's Father undermines his testimony significantly." The order further stated:

> "Defendant's Father also testified that, during the investigation prior to the trial, while being interviewed by the police, and with full knowledge that his son was wanted for murder, he never told the police that Defendant was with him at the time of the murder because 'they didn't ask'. This is practically unbelievable and greatly undermines Defendant's Father's credibility."

The order then summarized Iben's testimony that he had not called Bailey Sr. as a witness because:

> "(l) The State's case was weak, depending almost exclusively on a witness who was caught in a lie in an earlier portion of this case (Torlando McDonald, who had been implicated in a prior murder, pleading guilty to Aggravated Battery); (2) Family alibis are notoriously suspicious to juries; and (3) There was no corroboration of this proposed alibi."

The court found that "Attorney Iben's decision regarding how to proceed with this case was legitimate trial strategy. The use of Defendant's Father as an alibi witness would have been of little value and would likely have weakened Defendant's defense." Finally, it ruled that "Defendant has

not met his burden of proof (a preponderance of the evidence, the legal standard necessary for post-conviction relief)."

¶ 24    This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    Defendant appeals the trial court's denial of his petition for postconviction relief after a third-stage evidentiary hearing. The Post-Conviction Hearing Act established a three-stage process that allows incarcerated individuals to challenge their criminal convictions. 725 ILCS 5/122-1 *et seq.* (West 2022); *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997). At the first stage, the court determines whether the petitioner has stated an arguable claim of a constitutional violation. If so, the petition advances to the second stage, the court appoints an attorney for an indigent defendant, and the State can answer or move to dismiss the petition. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006); *People v. Hodges*, 234 Ill. 2d 1, 10-11 (2009); 725 ILCS 5/122-4 (West 2022). If the court does not dismiss the petition at the second stage, it conducts a third-stage evidentiary hearing. *Pendleton*, 223 Ill. 2d at 472-73. The third-stage hearing " 'is a new and independent investigation, with the hearing court authorized and required to use any proper procedure necessary and appropriate in order to discharge its duty of determining the existence or nonexistence of facts which would constitute a denial of a claimed constitutional right.' " *People v. Ruiz*, 177 Ill. 2d 368, 383 (1997) (quoting *People v. Wakat*, 415 Ill. 2d 610, 616-17 (1953)). To prevail, the defendant must show by a preponderance of the evidence that a constitutional right was violated. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 27    On appeal, defendant argues that the trial court erred when it denied his claim that his trial counsel was constitutionally ineffective. When a trial court denies a petition for postconviction relief after a third-stage evidentiary hearing, we will reverse that decision only if it

was manifestly erroneous. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Manifest error is that which is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Coleman*, 2013 IL 113307, ¶ 98. A decision is manifestly erroneous when the opposite conclusion is clearly evident. *Id.*

¶ 28        Defendant asks us to review this case *de novo*, citing *People v. Rodriguez*, 402 Ill. App. 3d 932, 939 (2010). In *Rodriguez*, four codefendants were sentenced to prison for murder. The trial court sentenced one of the defendants to 50 years' incarceration, one of them to 48 years' incarceration, and the remaining two to 40 years' incarceration. *Id.* at 934. Later, after the most culpable defendant's sentence was reduced from 50 years to 28 years, the remaining three codefendants petitioned for postconviction relief, arguing that the sentencing disparity was unconstitutional. *Id.* at 936. The court dismissed those petitions, and the codefendants appealed.

¶ 29        The First District reviewed the sentencing disparity *de novo*. *Id.* at 939. Although the appellate court typically reviews third-stage postconviction petitions for manifest error, the First District reasoned that if "no credibility determinations are necessary, *i.e.*, no new evidence is presented and the issues are purely legal questions, we review the trial court's judgment *de novo*, unless the presiding judge has some relevant special expertise or familiarity with the trial or sentencing of the defendant." *Id.* The court found that it could review the petition without regard to any new factual findings, credibility determinations, or any special expertise of the trial court. Instead, the court found that the case presented a "purely legal issue," so it reviewed the case *de novo*. *Id.*

¶ 30        *De novo* review clearly does not apply here. We are asked to review the trial court's findings regarding defendant's trial attorney's strategy, his father's potential testimony at trial, and the credibility of the witnesses. New evidence was introduced, and the questions presented are not

"purely legal." Moreover, defendant's petition depends on the credibility of his father's testimony and the potential value of that testimony at trial. We were not present for his testimony, but the trial court was. This is precisely the kind of special "familiarity" that warrants deference to the trial court's decision. *Id.*; see *Coleman*, 2013 IL 113307 ¶ 97 (noting that credibility determinations "are uniquely appropriate for trial judges to make;"); see also *Coleman*, 183 Ill. 2d at 384 (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)) (summarizing prior cases, holding "that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' "). Indeed, "[a]ny time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68. Recognizing the trial court's advantageous position, we review its decision for manifest error. *Coleman*, 183 Ill. 2d at 385.

¶ 31    Defendant claims that he was denied his right to an attorney because his trial attorney was ineffective. The United States Constitution and the Illinois Constitution both guarantee criminal defendants the right to effective assistance of counsel. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). A defendant receives ineffective assistance if his counsel's performance was deficient and that deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Trial counsel's performance was deficient if it was objectively unreasonable under prevailing professional norms. *Domagala*, 2013 IL 113688, ¶ 36. To show prejudice, the defendant must demonstrate a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 32        The trial court concluded that defendant had not proved by a preponderance of the evidence that his trial counsel was ineffective. The court found defendant's father's testimony to be highly unreliable and incredible. The court found Bailey Sr.'s testimony was undermined by his uncertainty regarding what times he saw defendant at his house. The court was especially suspicious of Bailey Sr.'s testimony that "during the investigation prior to the trial, while being interviewed by the police, and with full knowledge that his son was wanted for murder, he never told the police that Defendant was with him at the time of the murder because 'they didn't ask.' " It also summarized defendant's trial attorney's reasoning that:

> "(l) The State's case was weak, depending almost exclusively on a witness who was caught in lie in an earlier portion of this case (Torlando McDonald, who had been implicated in prior murder, pleading guilty to Aggravated Battery); (2) Family alibis are notoriously suspicious to juries; and (3) There was no corroboration of this proposed alibi."

The court concluded, "Attorney Iben's decision regarding how to proceed with this case was legitimate trial strategy. The use of Defendant's Father as an alibi witness would have been of little value and would likely have weakened Defendant's defense."

¶ 33        Defendant argues that the trial court's order was manifestly erroneous. He argues that at trial, the State relied primarily on the testimony of McDonald, an unreliable accomplice in the murder, but trial counsel presented no defense, and adding testimony from defendant's father

would have refuted McDonald's testimony. He argues that the court failed to recognize the value of alibi testimony from family members. Other courts have found that failure to call a defendant's close associates as witnesses could constitute ineffective assistance of counsel. See, *e.g.*, *People v. Skinner*, 220 Ill. App. 3d 479, 485-87 (1991); *People v. O'Banner*, 215 Ill. App. 3d 778, 791 (1991); *Brady v. Pfister*, 711 F.3d 818, 824 (7th Cir. 2013). Defendant insists that the court misconstrued his father's testimony about when he saw defendant. Regarding Bailey Sr.'s meeting with the police, defendant cites the police report from the time of the interaction to show that the purpose of the interview was primarily to locate defendant, so the court misinterpreted Bailey Sr.'s silence about his son's alibi.

¶ 34        The State argues that defendant's trial attorney ably represented defendant at trial. His strategy centered on scrutinizing the weaknesses of the State's case. He cross-examined McDonald extensively, challenged his credibility, and highlighted the lack of physical evidence connecting defendant to the crime, so he was not ineffective. The State also argues that regardless of whether defendant's trial counsel's strategy was defective, the father's testimony would not have helped him at trial, so he has not shown prejudice. The State points to the Third District's conclusion on direct appeal that the evidence against defendant was "overwhelming." *Bailey*, No. 3-08-0235 (unpublished order under Illinois Supreme Court Rule 23). In contrast, the trial court found that Bailey Sr.'s testimony was incredible and could have hurt defendant's case.

¶ 35        We find that the trial court did not commit manifest error when it ruled that defendant had not shown ineffective assistance of counsel by a preponderance of the evidence. We uphold the trial court's order based on lack of prejudice, so we need not determine whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (citing *Strickland*, 466 U.S. at 697). The trial court found that the "use of Defendant's Father as an alibi

witness would have been of little value and would likely have weakened Defendant's defense." Based on the trial record and defendant's father's testimony at the third-stage hearing, we cannot say that the court's evaluation was plainly or indisputably wrong. *Coleman*, 2013 IL 113307, ¶ 98.

¶ 36 At trial, McDonald testified that defendant was present at the murder scene, argued with the victim, handed the gun to his accomplice, and instructed him to kill the victim. He testified that defendant later told him that the victim " 'had to go' " because he knew what happened to defendant's stolen money. The jury found McDonald's testimony sufficiently credible to convict defendant.

¶ 37 Although defendant characterizes McDonald's testimony as weak because McDonald was an accomplice who received a generous plea deal from the State in exchange for his cooperation, his account of the murder was corroborated by extensive physical evidence and other witnesses' testimony regarding the condition of the crime scene. McDonald described an argument that began in the living room with the victim Darren bagging drugs. When Bailey attempted to shoot the victim, the gun misfired. Darren jumped up, and Bailey hit him with the gun. They wrestled with each other into the bathroom, where Bailey fired the gun. They moved into the kitchen, where Bailey fired again. Finally, after McDonald left through the front door, he heard more shooting from outside the apartment. McDonald's description matched closely with the condition of the crime scene and the evidence found there, including the sandwich bags in the living room, the recovered cartridges, cartridge cases, and bullets, the signs of a struggle in the bathroom and kitchen, the apparently undisturbed bedroom, and the location of the body. McDonald's account also explained the victim's injuries as observed by Dr. Hnilica in her autopsy, including his bruising and bullet wounds. This correspondence between the crime scene and McDonald's account bolstered his testimony.

¶ 38    Similarly, the testimony of Marion, the victim's wife, confirmed part of McDonald's narrative. Marion testified that defendant had been living with her and the victim and that not long before the murder, defendant's money had been stolen. McDonald testified that defendant blamed the victim for his money being stolen, and defendant confronted the victim about it. McDonald also testified that he spoke to defendant on the phone after the murder and defendant said that the victim " 'had to go' " because defendant's " 'money came up missing.' " Marion's testimony reinforced McDonald's account of defendant's motive.

¶ 39    The jury was aware of McDonald's plea deal in exchange for his testimony and his previous conviction for aggravated battery, but it found all this evidence sufficient to convict. Indeed, on direct appeal, the Third District found the evidence against defendant "overwhelming." *Bailey*, No. 3-08-0235 (unpublished order under Illinois Supreme Court Rule 23).

¶ 40    In contrast, at the third-stage hearing, the trial court found the testimony of defendant's father was "practically unbelievable." As defendant's trial counsel reasoned, a jury could have treated defendant's father's testimony skeptically, since he could be willing to lie to protect his son. This possibility alone would not be a sufficient basis to reject his testimony. More importantly, the court heard Bailey Sr. testify and found his specific claims highly implausible. He claimed that he was playing video games with defendant for four hours, from midnight to 4 a.m., before going to work only a few hours later. The court did not believe this because defendant's father did not mention this to the police at all during their investigation. The court commented:

> "If I had knowledge that would clear my son of a murder charge, they would have had to gag me to stop me from volunteering that information. I wouldn't say, oh, I hope they're going to ask me about that. I'm just dying to tell them this. Rats, they never asked me. I don't know. Good luck, son."

¶ 41    Defendant attempts to rehabilitate his father's testimony on appeal. First, defendant argues that the trial court misrepresented his father's testimony. The order summarized Bailey Sr.'s testimony as follows: "(1) Defendant was with him from midnight to at least 7:00 a.m.; (2) Defendant was with him from midnight to 6:00 a.m.; and (3) From 4:15 a.m. to 6:00 a.m., Defendant's Father was asleep. The lack of certainty by Defendant's Father undermines his testimony significantly." Defendant argues that this mischaracterizes Bailey Sr.'s testimony. Bailey Sr. consistently testified that he was playing video games with defendant until about 4:15 a.m. and then went to bed. He woke up around 6 a.m. and saw defendant on the couch. He left for work around 7 a.m., and defendant was still asleep on the couch. During postconviction counsel's direct examination of Bailey Sr., the attorney asked unclear questions, presuming that Bailey Sr. left at 6 a.m. instead of 7 a.m. and that defendant was "continuously *** in [Bailey Sr.'s] presence." But these were simply confusing questions, defendant maintains, and they do not show any inconsistency in Bailey Sr.'s testimony. More importantly, the murder occurred sometime around 3 a.m., so the difference between 6 a.m. and 7 a.m. is irrelevant.

¶ 42    Although we agree that some of defendant's attorney's questions during his direct examination appear unclear and that this portion of the trial court's order is imprecise, we do not find that this was essential to the court's reasoning. Based on the court's comments during the third-stage hearing and its written order, we find that Bailey Sr.'s meeting with the police officers was more significant to the court.

¶ 43    Regarding Bailey Sr.'s interaction with the police, defendant directs us to the police report from the officers' interaction with his father. He argues that the officers were merely trying to locate defendant, and they did not ask whether his father knew where defendant was on the date

of murder, so his father could reasonably have decided not to say anything to the police about his son's alibi.

¶ 44    We note that the State has not raised any challenge to us considering this report or the statements contained therein. Regardless, we find that the report does not support defendant's argument. We observe that the police report indicates that the officers first met Bailey Sr. at his place of employment, and he told them there that he did not know defendant's whereabouts. He admitted that defendant had lived with him until about one month prior. According to the report, the officers spoke to Bailey Sr. "at length regarding this investigation." The officer asked for Bailey Sr.'s permission to search his home "in case his son Stephen Jr., had tried to hide any evidence of this crime." Bailey Sr. consented, and the officers accompanied Bailey Sr. back to his home and conducted a search. Bailey Sr. even admitted to the officers that he had recently found a plastic bag containing 9-millimeter bullets in his garage. Based on this report, this interaction was more than a cursory questioning about defendant's location. We do not find that the police report refutes the trial court's conclusions when Bailey Sr. consented to a search of his home and returned there with police officers while never mentioning that he had evidence that his son was innocent.

¶ 45    Next, defendant argues that perhaps his father never mentioned his alibi to the officers because he did not know the date of the murder when he spoke to them. If Bailey Sr. did not know when the murder occurred, he would have had no reason to tell the officers that he was with defendant at that time. According to defendant, the trial court should not have presumed that Bailey Sr. willfully withheld this information from the police when the record does not show that he was aware that he had any relevant information to give. He says that the police report does not indicate that the officers asked Bailey Sr. about the specific date of the murder.

¶ 46    We do not find this argument compelling because it does not match with Bailey Sr.'s own testimony. Bailey Sr. admitted that he had seen in the newspaper that defendant was wanted for murder before he spoke to the police. When asked why he did not tell the officers that he was with defendant at the time of the murder, Bailey Sr. responded that he did not think they would believe him and that they did not ask. Notably, he did not testify that he had not known the date of the murder. Indeed, by saying that he did not think the police would believe him, he implied that he could have told them. He said nothing about not realizing that he had relevant information.

¶ 47    Besides the testimony of Bailey Sr. and defendant, the trial court also considered the testimony of defendant's trial attorney, Iben. Iben testified that in his opinion, Bailey Sr.'s testimony would have been very weak and could have frustrated his defense. He testified that before trial, he would have investigated the potential alibi for corroborating evidence, but he found nothing to support Bailey Sr.'s claim. He explained his concern that the prosecutor at trial could have cross-examined Bailey Sr. and made "the defense look like idiots." Rather than risk this possibility, Iben preferred to focus on the limitations of the State's case. He had urged the jury to be "scrupulous in their examination of evidence generally," so he did not want to present his own "speculative" evidence through the father's testimony. The risk that Bailey Sr.'s weak testimony would have compromised defense counsel's argument persuaded the court, as it concluded that the father's testimony "would likely have weakened Defendant's defense."

¶ 48    In summary, when the finder of fact at trial considered McDonald's testimony, that fact finder found his testimony sufficient to convict defendant beyond a reasonable doubt. In contrast, when the postconviction fact finder considered the testimony of Bailey Sr., that fact finder found the testimony so incredible that it was more likely to have hurt defendant than helped. We reiterate that, as the reviewing court, we must recognize that the trial court was able to see and

hear the witnesses and therefore held a superior position in assessing their testimony. *Coleman*, 183 Ill. 2d at 384. After reviewing the record and considering defendant's attempts to bolster his father's testimony, we find that it was reasonable for the trial court to conclude that Bailey Sr.'s testimony was not sufficiently credible to satisfy defendant's burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92. At the very least, we do not find that the opposite conclusion is clearly evident. *Id.* ¶ 98. The trial court's denial of defendant's petition was not manifest error. Accordingly, we affirm the denial of defendant's petition.

¶ 49                                    III. CONCLUSION

¶ 50            For the reasons stated, we affirm the trial court's judgment.

¶ 51            Affirmed.